KYLE C. BISCEGLIE (KB 6052)
HOWARD J. SMITH (HS 3556)
BARTON BARTON & PLOTKIN LLP
420 Lexington Avenue
New York, NY 10170
(212) 687-6262
kbisceglie@bartonesq.com
hsmith@bartonesq.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE CHIN

08 CV 2924

---

MARVEL ENTERTAINMENT, INC. f/k/a
MARVEL ENTERPRISES, INC., a
Delaware corporation, and MARVEL
CHARACTERS, INC., a Delaware corporation,

              Plaintiffs,

      -against-

KELLYTOY (USA), INC.,

              Defendant.

---

___ Civ. _____ (2008)

**COMPLAINT**

MAR 2 0 2008

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs MARVEL ENTERTAINMENT, INC. f/k/a MARVEL ENTERPRISES, INC.

and MARVEL CHARACTERS, INC. (collectively "Marvel" or "Plaintiffs"), by their attorneys,

for their complaint against defendant KELLYTOY (USA), INC. ("Kellytoy" or "Defendant"),

respectfully allege as follows:

## INTRODUCTION

1.    This is a civil action by Marvel against Defendant for breach of contract,

copyright and trademark infringement, false advertising, false designation of origin, false

representations and unfair competition, and injury to business reputation arising out of

Defendant's unauthorized, unlicensed and unlawful exploitation of certain fictional characters in which Marvel owns the exclusive rights.

## JURISDICTION AND VENUE

2.     This action arises under the U.S. Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, and the Lanham Act of 1946, 15 U.S.C.A. §§ 1051 *et seq.*  This Court has jurisdiction over the subject matter of Plaintiffs' claims arising thereunder pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1367.  This Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).  The Court further has jurisdiction over the subject matter of Plaintiffs' claims pursuant to 28 U.S.C. §§ 1332(a)(1) as an action between citizens of different states.

3.     The Court has personal jurisdiction over Defendant by virtue of its transacting and doing business in this district.  According to its website, Defendant maintains an office at 400 East 71st Street, Apt. 18-I, New York, NY 10021.  The Court also has personal jurisdiction over Defendant by virtue of a forum selection clause in the license agreement between Marvel and Defendant by which Defendant agreed that all disputes between the parties are subject to the jurisdiction of the state or federal courts in New York.

4.     Venue lies in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(a)(1) and (a)(2), and 28 U.S.C. § 1391(b) in that the claims arose in this judicial district as a result of acts committed by Defendant doing business in this judicial district.

5.     Marvel and Defendant, also, agreed that this dispute would be resolved under New York law.

## PARTIES

6.     Plaintiff, Marvel Entertainment, Inc. is and at all times hereinafter mentioned has been a corporation duly organized and existing under and by virtue of the laws of the State of

Delaware, with an office at 417 Fifth Avenue, New York, New York, 10016. Marvel Entertainment, Inc. was formerly known by the name Marvel Enterprises, Inc.

7.    Plaintiff Marvel Characters, Inc. is and at all times hereinafter mentioned has been a corporation duly organized and existing under and by virtue of the laws of the State of Delaware. Marvel Characters, Inc. maintains its principal office at 9242 Beverly Boulevard, Los Angeles, California 90210.

8.    Marvel is one of the leading comic book/entertainment and licensing companies in the world, and owns a library of over 5,000 proprietary characters (the "Marvel Characters"), including the including the X-MEN, SPIDER-MAN, THE FANTASTIC FOUR, GHOST RIDER, DAREDEVIL, and THE AVENGERS. Plaintiffs' business is based on the exploitation of the Marvel Characters and other intellectual property through licensing, publishing, comic books, television and movie productions, and other similar ventures.

9.    Merchandising and licensing of Marvel's intellectual property comprise a substantial portion of Marvel's annual income. Accordingly, protection of Marvel's intellectual property rights is the crux of Plaintiffs' longevity and success, and Plaintiffs are vigilant and zealous in their efforts to maintain the fullest protection the law allows. Marvel has hundreds of copyright registrations for its comic book publications with the United States Copyright Office, and has registered many of the names of Marvel Characters and comic book series titles in the United States Patent and Trademark Office. In particular, Marvel has registered its copyrights in each of the Marvel Characters at issue in this litigation. In addition, Marvel has registered its trademark in the name "Marvel."

10.    Upon information and belief, defendant Kellytoy, is and at all times hereinafter mentioned has been a corporation, organized and existing under and by virtue of the laws of the

State of California.  Upon further information and belief, Kellytoy maintains its principal office at 4811 S. Alameda Street, Los Angeles, CA 90058.

## FACTUAL BACKGROUND

11.    In 2005, Marvel granted Defendant a certain license for the exploitation by Kellytoy of certain Marvel Characters in connection with specifically delineated "Licensed Articles."  License Agreement No. D04200 had a stated term commencing on January 1, 2005 and expiring on December 31, 2007.  License Agreement D04200 was amended on January 1, 2006 and again on April 1, 2006.  (License Agreement No. D04200, together with the two amendments, referred to herein as the "License Agreement.")  A true and accurate copy of the License Agreement is annexed hereto as Exhibit A.

12.    The License Agreement specifically provides that Kellytoy's rights under the License Agreement were limited to a specifically delineated "Territory."  The Territory of the License Agreement was the "United States, its territories and possessions, all US military bases, and Canada."

13.    The License Agreement also specifically provides that, for certain Licensed Articles, Kellytoy was only permitted to sell such Licensed Articles in certain specifically delineated "Channels of Distribution."

## EXPIRATION OF THE LICENSE AGREEMENT

14.    Per its stated terms, the License Agreement expired on December 31, 2007.

15.    Section 16(a) of the License Agreement states in pertinent part:

Immediately upon the expiration or of this license for any cause whatsoever, all the rights granted to Licensee hereunder shall cease and revert to Marvel who shall be free to license others to use any or all of the rights granted herein effective on and after such date of expiration or termination.  To this end, Licensee will be deemed to have automatically assigned to Marvel upon such expiration or termination, all copyrights, trademark and service mark rights, equities, good will, titles and other rights in or to the Property… .

Exhibit A, Section 16(a).

16.     On or about January 30, 2008, <u>after</u> the License Agreement expired on December 31, 2007, Marvel wrote Defendant that it had received information that Defendant was selling and soliciting orders for Licensed Articles after the expiration of the License Agreement and ii) outside of the Territory of the License Agreement.  Specifically, Marvel noted that Kellytoy products bearing Marvel intellectual property was found being sold or solicited in Spain, France, Panama, Nicaragua, Mexico, El Salvador and China.

17.     Marvel warned Defendant that "the unauthorized sale of such product constitutes a serious violation of US copyright and trademark laws, international laws, and also violates certain other licensees' rights to their use of the Property and other derivative properties."

18.     Notwithstanding the clear provisions of the License Agreement, and notwithstanding Marvel's notice to Defendant to cease and desist all use of Marvel's property as of the expiration date, Defendant has refused to do so and continues sell unauthorized Marvel product.

19.     The License Agreement strictly prohibits "Use after Termination" in section 17(b):

> Licensee acknowledges that its failure to cease the use of the Property or to cease sale or distribution of the Licensed Articles at the termination or expiration of this license, except as expressly provided herein, will result in immediate and irreparable damage to Marvel and to the rights of any subsequent licensee. Licensee acknowledges and admits that there is no adequate remedy at law for such failure, and Licensee agrees that in the event for such failure, Marvel shall be entitled to injunctive relief and such other and further relief as any court with jurisdiction may deem just and proper.

Exhibit A, Section 17(b).

20.     Marvel sent additional cease and desist notices to known international distributors of Defendant, informing them that Defendant's license agreement had expired and that

Defendant no longer had any valid rights to produce or sell Marvel licensed goods.  The notices also informed Defendant's international distributors that Defendant never had rights to distribute outside of the United States or Canada and that any assertions made by Defendant on their international rights or renewal of rights were false.

21.    Defendant was also recently found soliciting Marvel licensed goods in the Las Vegas ASD/AMD Trade Show and the New Jersey Shore Show in March.

22.    Defendant continues to exploit Marvel's intellectual property.

## RIGHT TO AUDIT

23.    Section 5 of the License Agreement provides that Marvel has the right to audit "records and books of account and all other documents and materials in the possession or under the control of the Licensee [Defendant] relating or pertaining to the subject matter or provisions of this Agreement and to make copies and/or extracts therefrom."

24.    Defendant is required to provide accurate information and respond to Marvel's inquiries during the audit.

25.    Marvel is attempting to conduct such an audit and Defendant has and continues to provide Marvel with misleading and incorrect information.

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT
### (under state common law)

26.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 25 contained herein, inclusive together with the same force and effect as if set forth more fully at length herein.

27.    In or around January 2005, Marvel and Defendant entered into the License Agreement.  The License Agreement had a stated term of January 1, 2005 through December 31, 2007.

28.     Plaintiffs have fully performed under the License Agreement.

29.     The License Agreement expired on December 31, 2007 and was not renewed or extended.

30.     Defendant has failed to comply with its post-termination obligations under the Agreement by, *inter alia*, continuing to hold itself out as a licensee of Marvel; refusing to cease its use of the Property; refusing to take any steps to disassociate itself from Marvel (Defendant has continued to hold itself out as a licensee of Marvel); continuing to use trade or business names containing the name and mark of Marvel; refusing to furnish any evidence of compliance with Section 16 of the License Agreement; and refusing to cooperate with Marvel's post-expiration rights under the License Agreement to audit Defendant.

31.     In violation of the License Agreement, Defendant has, since the expiration of the License Agreement, and without any authority to do so, willfully continued its unauthorized and unlicensed use of Marvel's intellectual and other property.  Such sales are completely unlicensed and unauthorized.

32.     In addition, Defendant has, since the expiration of the License Agreement, and without any authority to do so, willfully continued to sell property containing Marvel's intellectual property outside the Territory permitted in the License Agreement.   Upon information and belief, Defendant also sold outside the Territory permitted in the License Agreement prior to the expiration of the License Agreement on and before December 31, 2007.

33.     Defendant also has, since the expiration of the License Agreement, and without any authority to do so, willfully continued to sell certain property containing Marvel's intellectual property outside the Channels of Distribution permitted in the License Agreement. Upon information and belief, Defendant also sold outside the Channels of Distribution permitted

in the License Agreement prior to the expiration of the License Agreement on December 31, 2007.

34.    Per Section 3(b) of the License Agreement, "in the event that Licensee sells or exploits the Licensed Articles outside either the Territory or Channels of Distribution in violation of this Section 3(b), notwithstanding Sections 1(o) and 5(a), the royalty due Marvel on such sales shall be the Net Sales.  In addition, in the event Licensee sells or distributes the Licensed Articles outside of the Channels of Distribution, Licensee shall pay to Marvel, a sum in the amount of three dollars ($3) per unit sold outside the Channels of Distribution as Liquidated Damages, unless otherwise prohibited by law."

35.    In addition, Defendant is not cooperating with Marvel's efforts to conduct an audit and has thereby further breached the License Agreement.

36.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial but that is at least the amount of Defendant's unauthorized net sales plus three dollars ($3) per item for all items sold outside the permitted Channels of Distribution and the cost of Marvel's audit of Defendant.

<strong>SECOND CLAIM FOR RELIEF FOR<br><u>BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING</u></strong>

37.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 36 contained herein, inclusive together with the same force and effect as if set forth more fully at length herein.

38.    Under New York law, Defendant owed Marvel a duty of good faith and fair dealing under the License Agreement.

39.     Defendant's duty of good faith and fair dealing includes, among other things, Defendants obligation to comply in good faith with Marvel's rights under the License Agreement to conduct an audit of Defendant.

40.     Defendant has violated the covenant of good faith and fair dealing that is implied by law in every contract by failing to cooperate with Marvel's audit of Defendant and by providing Marvel with misleading and incorrect information in connection with such audit.

41.     As a result, Marvel is entitled to damages in an amount to determined at trial and for the cost of Marvel's audit.

**THIRD CLAIM FOR RELIEF FOR**
**DIRECT COPYRIGHT INFRINGEMENT**
**(under 17 U.S.C. §§ 101 *et seq.*)**

42.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 41 contained herein, inclusive together with the same force and effect as if set forth more fully at length herein.

43.     Plaintiffs own all right, title, and interest in the Marvel Characters.

44.     Plaintiffs have complied in all respects with the provisions of the Copyright Act of 1976, and hold valid copyright registrations in the aforesaid Marvel Characters.

45.     Marvel is the owner of the entire right, title and interest in and to, or is the exclusive licensee of, *inter alia*, the registered copyrights in and to the likenesses of its world-famous characters set forth in Exhibit B attached hereto.

46.     Without the consent of Plaintiffs and in complete willful and wanton disregard of Plaintiffs' rights, Defendant has, since the expiration of License Agreement on December 31, 2007, intentionally infringed and continues to infringe Plaintiffs' above-mentioned copyrights by continuing to sell merchandise featuring the protected Marvel Characters without authorization

to do so, each such item bearing artwork, images, likenesses, names and/or characteristics identical to Plaintiffs' protected Marvel Characters.

47.    Plaintiffs believe that Defendant will continue to intentionally disregard Plaintiff's copyrights by means of the continuing to offer for sale merchandise bearing artwork, images, likenesses, names and/or characteristics identical to Plaintiffs' protected Marvel Characters.

48.    The unauthorized and infringing use by Defendant of Plaintiffs' protected Marvel Characters as described hereinabove is causing irreparable harm, damage and injury to Plaintiffs in that the unauthorized and unlicensed exploitation of the protected Marvel Characters will severely diminish the value of the original works by diluting the market and destroying the distinctiveness of the works and their identity as being the exclusive property of Plaintiffs, and will enable Defendant to profit and benefit from its unauthorized use of Plaintiffs' intellectual property.

49.    By reason of the foregoing, Plaintiffs are entitled to damages for Defendant's infringement of their copyrights, pursuant to 17 U.S.C. § 504.

50.    By reason of the foregoing, Plaintiffs are entitled to their costs and attorneys' fees pursuant in prosecuting this action, pursuant to 17 U.S.C. § 505.

51.    By reason of the foregoing, because Defendant's conduct was and is willful, Plaintiffs are entitled to the maximum statutory damages allowed pursuant to 17 U.S.C. § 504(c).

## FOURTH CLAIM FOR RELIEF FOR
## DIRECT TRADEMARK INFRINGEMENT
### (under 15 U.S.C. § 1114(1)(a))

52.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 51 contained herein, inclusive together with the same force and effect as if set forth more fully at length herein.

53.     Plaintiffs are the owners of federal trademark registrations for various Marvel Characters.  In addition, Marvel has used the trademark Marvel in association with its comic book publications for over 50 years and has been the owner of a federal trademark registration of the mark MARVEL for publications since 1969.  Plaintiffs' extensive use of these characters and their respective likeness in comic books, merchandising, movie rights and other such endeavors have made Marvel Characters and the Marvel mark highly distinctive and well known throughout the world.

54.     Marvel is the owner of the entire right, title and interest in and to, or is the exclusive licensee of, *inter alia*, the registered trademarks on the Principal Register of the United States Patent and Trademark Office set forth in Exhibit C attached hereto.  The marks designated with an asterisk in Exhibit C have become incontestable pursuant to 15 U.S.C. § 1065.

55.     Defendant knew that Plaintiffs maintained valid registrations of the aforesaid marks with the United States Patent and Trademark Office.

56.     Defendant has and continues to willfully use the aforesaid trademarks of Plaintiffs without Plaintiff's authorization or consent.  Such conduct by Defendant is likely to cause confusion, mistake or deception among consumers as to whether their goods are approved by Plaintiffs, because the designs, colors and likenesses of Plaintiffs' trademarks used by Defendant, together with Defendant's unauthorized use of the protected Marvel Characters, make those goods identical or substantially similar to those of Plaintiffs.  Thus, Defendant's conduct constitutes willful infringement of Plaintiffs' trademarks in violation of 15 U.S.C. § 1114(1)(a).

57.     Defendant's intentional and knowing use of Plaintiffs' registered trademarks in continuing to offer for sale merchandise constitutes intentional use of a counterfeit mark of goods in violation of 15 U.S.C. § 1117(b).

58.    Defendant's intentional conduct in refusing to cease its unauthorized exploitation of Marvel's trademarks has caused and continues to cause injury and will cause injury in the future, to Plaintiffs, their operations, reputation and goodwill, including, but not limited to, injury to Marvel's core business of licensing and merchandising of the Marvel Characters.

59.    Defendant's infringement of Plaintiffs' trademarks has caused Plaintiffs to be injured in an amount to be determined at trial, and therefore Plaintiffs are entitled to the remedies provided for in 15 U.S.C. §§ 1116 *et seq.*, as well as 15 U.S.C. § 1117.

60.    By reason of the foregoing, Plaintiffs are entitled to Defendant's profits from their intentional infringements of Plaintiffs' trademarks, under 15 U.S.C. § 1117.

61.    By reason of the foregoing, Plaintiffs are entitled to damages in a specific amount to be determined at trial, from Defendant's intentional infringements of Plaintiffs' trademarks, under 15 U.S.C. § 1117.

62.    By reason of the foregoing, because Defendant's conduct is intentional, Plaintiffs are entitled to an amount three times the Defendant's profits or Plaintiffs' damages, whichever is greater, pursuant to 15 U.S.C. § 1117.

63.    By reason of the foregoing, because Defendant's conduct is intentional, Plaintiffs are entitled to costs and attorneys' fees pursuant to 15 U.S.C. § 1117.

64.    By reason of the foregoing, because Defendant's conduct is intentional, Plaintiffs are entitled to prejudgment interest pursuant to 15 U.S.C. § 1117.

**FIFTH CLAIM FOR RELIEF FOR**
**FALSE ADVERTISING, FALSE DESIGNATION OF ORIGIN, FALSE**
**REPRESENTATIONS AND UNFAIR COMPETITION**
**(15 U.S.C. § 1125(a))**

65.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 64 contained herein, inclusive together with the same force and effect as if set forth more fully at length herein.

66.    Defendant's acts alleged above, including its continued use of Marvel's intellectual property without any authorization to do so, constitute false advertising, false designation of origin, false representations and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

67.    Defendant's conduct as described herein has created, and will continue to create, a false impression and confusion and will deceive members of the public regarding the source, origin, affiliation, sponsorship or approval of, and the relationship between Marvel and, merchandise sold by Plaintiff; and the advertising, promotion and sale of Marvel-branded merchandise purchased from other authorized Marvel licensees.

68.    Defendant's acts have injured or are likely to injure Marvel's image and reputation with consumers by creating confusion about and dissatisfaction with Marvel's entertainment properties and character merchandise, with a resulting diminution of the value of the goodwill associated with Marvel's intellectual property and a loss of business and profits.

69.    Defendant's acts have injured or are likely to injure Marvel's reputation, business and relations with the trade, *i.e.*, licensing relationships, by causing trade dissatisfaction, with a resulting diminution of the value of the goodwill associated with Marvel's intellectual property, and a loss of business and profits.

70.    Defendant has continued to use Marvel's intellectual property notwithstanding that Defendant has actual knowledge of Marvel's exclusive trademark rights as alleged herein, and that Defendant has had not right to use <u>any</u> of Marvel's intellectual property since the expiration of the License Agreement on December 31, 2007.

71.    Defendant's continued use of the Marvel's intellectual property constitutes a bad faith, deliberate, intentional and willful attempt to trade on Marvel's business reputation, to confuse or deceive consumers, and to interfere with Marvel's business relationship with its customers, with a resulting substantial injury to Marvel's business.

72.    As a direct and proximate result of Defendant's infringement, Marvel is entitled to its damages and to Defendant's profits from its unlawful conduct, as well as Marvel's costs of suit and attorneys' fees, in an amount to be determined at trial.  Accordingly, Marvel is entitled to, among other things, a constructive trust on all tangible real and/or personal properties and assets, including but not limited to bank, savings and/or other financial accounts, consisting of or obtained by profits derived from Defendant's infringement of the Marvel's intellectual property.

73.    Defendant's conduct as alleged herein was willful, intentional and without foundation in law.  Accordingly, Marvel is entitled to an award of treble damages against Defendant pursuant to 15 U.S.C. § 1117(a).  This is also an exceptional case under 15 U.S.C. § 1117(a) entitling Marvel to an award of its attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF FOR**
**<u>INJURY TO BUSINESS REPUTATION</u>**
**(under New York General Business Law § 360-l)**

74.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 73 contained herein, inclusive together with the same force and effect as if set forth more fully at length herein.

75.    As a result of Defendant's aforesaid infringement of Plaintiffs' copyrights and trademark rights, Plaintiffs are likely to suffer injury to their business reputation, insofar as Plaintiffs will not be able to assure other licensees and/or potential licensees of Marvel Characters that such licensees will be protected in certain markets, certain industries, or certain channels of distribution from concentrated competition from goods utilizing the Marvel Characters.  Because merchandising and licensing of Plaintiffs' intellectual property comprises a substantial portion of Plaintiffs' annual income, Defendant's infringement will likely cause Plaintiffs to suffer injury to a very crucial part of their business, in violation of New York General Business Law § 360-l.

76.    Defendant willfully infringed, and continues to infringe, Plaintiffs' copyright and trademark rights in the Marvel Characters and the Marvel mark, and/or knew or should have known that its infringement would likely cause Plaintiffs to suffer injury to a very crucial part of their business.

77.    By reason of the foregoing conduct of Defendant, Plaintiffs are entitled to Defendant's profits derived from its wrongful exploitation of Plaintiffs' intellectual property pursuant to NY CLS Gen. Bus. § 360-m.

78.    By reason of the foregoing conduct of Defendant, Plaintiffs are entitled to damages suffered by reason of Defendant's exploitation of Plaintiffs' intellectual property pursuant to NY CLS Gen. Bus. § 360-m.

79.    By reason of the foregoing conduct of Defendant, Plaintiffs are entitled to three times Defendant's profits and Plaintiffs' damages, by reason of Defendant's wrongful exploitation of Plaintiffs' intellectual property pursuant to NY CLS Gen. Bus. § 360-m.

80.    By reason of the foregoing conduct of Defendant, Plaintiffs are entitled to attorneys' fees by reason of Defendant's wrongful exploitation of Plaintiffs' intellectual property pursuant to NY CLS Gen. Bus. § 360-m.

**WHEREFORE**, Plaintiffs pray for a judgment against Defendant, as follows:

1.    On the First Claim for Relief for Breach of Contract:

   a.    For damages in an amount to be determined at trial but that is at least the amount of Defendant's unauthorized net sales plus three dollars ($3) per item for all items sold outside the permitted Channels of Distribution; and

   b.    For costs of suit and attorneys' fees incurred herein.

2.    On the Second Claim for Relief for Breach of the Duty of Good Faith and Fair Dealing:

   a.    For damages in an amount to be determined at trial;

   b.    Marvel's cost of audit; and

   c.    For costs of suit and attorneys' fees incurred herein.

3.    On the Third Claim for Relief for Copyright Infringement:

   a.    For such damages as Plaintiffs have sustained as a result of Defendant's infringement of Plaintiffs' copyrights in and to the Plaintiffs' characters including, but not limited to, any and all profits gained by Defendant as a result of its infringing activities, or, if appropriate pursuant to federal copyright law, for any and all damages provided for by statute;

   b.    For costs of suit and attorneys' fees incurred herein; and

   c.    By reason of the foregoing, because Defendant's conduct was and is willful, Plaintiffs are entitled to the maximum statutory damages allowed pursuant to 17 U.S.C. § 504(c).

4.      On the Fourth Claim for Relief for Trademark Infringement in violation of the Lanham Act 15 U.S.C. § 1114(1)(a) in an amount to be proven at trial:

  a.      For disgorgement of all Defendant's profits as a result of its infringements upon Plaintiff's registered trademark intellectual property; and

  b.      For such damages as Plaintiffs have sustained as a result of Defendant's infringement of Plaintiffs' registered trademark intellectual property; and

  c.      For an amount three times Defendant's profits or Plaintiffs' damages, whichever is greater; and

  d.      For costs of suit and attorneys' fees incurred herein; and

  e.      For prejudgment interest.

5.      On the Fifth Claim for false advertising, false designation of origin, false representations and unfair competition:

  a.      Damages and to Defendant's profits from its unlawful conduct, in an amount to be determined at trial.  Accordingly, Marvel is entitled to, among other things, a constructive trust on all tangible real and/or personal properties and assets, including but not limited to bank, savings and/or other financial accounts, consisting of or obtained by profits derived from Defendant's infringement of the Marvel's intellectual property.

  b.      Because Defendant's conduct as alleged herein was willful, intentional and without foundation in law.  Accordingly, Marvel is entitled to an award of treble damages against Defendant pursuant to 15 U.S.C. § 1117(a).

  c.      Because this is also an exceptional case under 15 U.S.C. § 1117(a) entitling Marvel to an award of its attorneys' fees and costs.

6.    On the Sixth Claim for Relief for Injury to Business Reputation under NY CLS Gen Bus § 360-l:

    a.    For an order requiring Defendant to deliver for destruction any and all products or other physical items in Defendant' possession that infringe upon Plaintiffs' trademarks; and

    b.    For disgorgement of all Defendant's profits as a result of their intentional interference with Plaintiff's business relations and registered trademark intellectual property; and

    c.    For such damages as Plaintiffs have sustained as a result of Defendant's intentional interference with Plaintiff's business relations and registered trademark intellectual property; and

    d.    For three times the amount of damages Plaintiffs have sustained as a result of Defendant's violation of NY CLS Gen Bus § 360-l; and

    e.    For costs and attorneys' fees.

7.    On all Claims for Relief:

    a.    For reasonable attorneys' fees;

    b.    For costs of suit incurred herein;

    c.    For interest thereon; and

    d.    For such other and further relief as the Court deems just and proper.

Dated: New York, New York
      March 20, 2008

BARTON BARTON & PLOTKIN LLP

_____
KYLE C. BISCEGLIE (KB 6052)
HOWARD J. SMITH (HS 3556)

18

# EXHIBIT A

LICENSE AGREEMENT          D04200

This License Agreement (the **"Agreement"**), when executed by both parties, is effective as of the 1st day of January 2005, by and between Marvel Enterprises Inc., a Delaware corporation with offices at 10 East 40th Street, New York, NY 10016 (**"Enterprises"**) and Marvel Characters, Inc., a Delaware corporation with an office at 10474 Santa Monica Boulevard, Suite 206, Los Angeles, California 90025 ("Character", Enterprises and Character, collectively **"Marvel"**), on the one hand and the party identified below (**"Licensee"**) on the other.

## 1.    BASIC INFORMATION AND TERMS

| (a) Licensee: | | Numbered Section |
|---|---|---|
| Kellytoy (USA), Inc.<br>4811 S. Alameda Street<br>Los Angeles, CA 90058 | Attention: Mr. Kelly<br>Tel:    323-588-8697<br>Fax:    323-584-9566<br>Email: JONATHANSKELLY@AOL.COM | |
| (b) Characters: | **Licensee shall only use one character per Licensed Article.  Co-mingling of more than one character on a Licensed Article shall require prior written approval from Marvel.**<br><br>The following characters as they appear in Marvel's comic book publications sold at retail (excluding characters and/or the portrayal of characters in comics based upon motion picture, television, video games or any other entertainment products) ("Classic Characters") limited to:<br><br>Spider-Man Classic Characters limited to:  Spider-Man, Black Cat, Spider-Girl, Spider-Woman, Rhino, Dr. Octopus, Venom, Green Goblin, Sandman, Vulture, Carnage, Hobgoblin, Kraven the Hunter, Lizard, Chameleon, Electro, Mysterio, Kingpin, Scorpion<br><br>Hulk Classic Characters limited to: The Incredible Hulk, She Hulk, Abomination, The Leader.<br><br>X-Men Classic Characters limited to:  Wolverine, Cyclops, Phoenix/Jean Grey, Rogue, Storm, Iceman, Professor X, Colossus, Nightcrawler, Beast, Gambit, Shadowcat, Bishop, Cable, Archangel, Psylocke, Forge, Banshee, Jubilee, Marrow, Havok, Polaris, Quicksilver, Cannonball, Siryn, Kazar, Longshot, X-Man, Magneto, Toad, Sabretooth, Mystique, Blob, Pyro, Apocalypse, Mr. Sinister, Sauron, Sentinels, Dark Phoenix, Mojo, Avalanche, Proteus, Omega Red, Lady Deathstrike, Juggernaut, Stryfe, Onslaught.<br><br>Fantastic Four Classic Characters limited to:  Mr. Fantastic, Human Torch, Invisible Woman, Thing, Inhumans (Black Bolt, Medusa, Gorgon, Triton), Mole Man, Galactus, Dr. Doom, Super Skrull, DiabloKlaw, Ronan the Destroyer | 2 |

Iron Man Classic Characters limited to: Iron Man

Daredevil Classic Characters limited to: Daredevil, Elektra, Bullseye and Kingpin.

Ghost Rider Classic Characters limited to: Ghost Rider

Various Classic Characters limited to: Captain America, Thor, Scarlet Witch, Sersi, Hercules, Quasar, Ant-Man, Wasp, Hawkeye, Justice, Firestar, Photon, Wonder Man, Vision, Moondragon, War Machine, Captain Marvel, Nick Fury, Falcon, Nova, Black Widow, Moonknight, Ultron, Kang, Red Skull, Crossbones, Hydra, Baron Zemo, Absorbing Man, Mandarin, Enchantress, Loki

---

The following movie based characters and elements (i.e. logos, titles and movie art style guides) ("Movie Characters"):

Hulk Movie Characters: The characters as they appear in the motion picture sequels to Hulk, subject to any actor/actress or studio agreements for such production.

X-Men Movie Characters: The characters as they appear in the motion picture sequels to X2 (X-Men 2), subject to any actor/actress or studio agreements for such production.

Fantastic Four Movie Characters: The characters as they appear in the motion picture Fantastic Four and any sequels, subject to any actor/actress or studio agreements for such production.

Iron Man Movie Characters: The characters as they appear in the motion picture Iron Man and any sequels, subject to any actor/actress or studio agreements for such production.

Daredevil or Elektra Movie Characters: The characters as they appear in the motion pictures Daredevil or Elektra and any sequels, subject to any actor/actress or studio agreements for such production.

Ghost Rider Movie Characters: The characters as they appear in the motion picture Ghost Rider and any sequels, subject to any actor/actress or studio agreements for such production.

The rights to create and sell such Licensed Articles based on such Movie Characters shall EXPIRE (with Post-Expiration Disposal Period as per Section 16(e)) ONE (1) YEAR FROM U.S. MOVIE RELEASE DATE, HOWEVER SUCH GRANT SHALL NEVER EXTEND BEYOND THE TERM SET FORTH IN SECTION 1(E). Licensee understands that the dates of the above referenced theatrical release(s) are controlled by the respective studio licensees and are subject to change without notice. Marvel makes no representations that any film(s) will be released at any particular

date or released within the Term or if released, shall be commercially successful and Licensee acknowledges that it has not entered into this Agreement based on any such representations. If a theatrical release does not occur during the Term, Licensee shall not be granted any rights in those Movie Characters.

Corresponding Classic Characters and Movie Characters for the same properties shall be referred to herein as a "Character Group" (except Spider-Man includes Classic Characters only, but may be referred to herein as a Character Group).

The following characters as they appear in the Spider-Man and Friends kids toy style guide ("Spider-Man & Friends Characters") limited to: Spider-Man, Spider-Girl, Storm, Wolverine, Hulk, Thor, Lizard, Rhino, and Captain America. The packaging and hangtags must have characters appear in a group of at least three or more and must include Captain America or Thor and no one character may be more prominent than another.

The following characters as they appear in the animated series X-Men Evolution: All Characters.

In the event Marvel owns and controls the merchandising rights and such rights would not violate a third party agreement, Licensee shall be granted the rights to all Characters in the Spider-Man Animated series created and broadcast in the 1990's.

Kellytoy (USA)

{00019562 SML}3

| (c) | Licensed Articles: | 1) Amusement Plush Dolls (non–articulated), without vinyl heads<br>2) Amusement Plush Bean Bags<br>3) Amusement Plush Key Chains/Key Rings<br>4) Amusement Play Balls and Sports Balls (individual or in sets, inflatable and non-inflatable)<br>5) Amusement Flags and Banners<br>6) Amusement Coin Purses<br>7) Amusement Clip-ons (non-articulated)<br>8) Amusement Plush splash disks AND/OR BALLS *SH*<br>9) Amusement Novelty Chairs<br>10) Amusement Plush Danglers (hanging on a string or suction cup), non-articulated, limited to 5.5"<br>11) Amusement Plush Magnets<br>12) Amusement Plush Banks (non-articulated)<br>13) Amusement Plush Pens or Pencil Toppers<br>14) Amusement Vinyl Boxing Gloves *SH*<br>15) Amusement ~~Plush Book Marks~~ PILLOWS *SH*<br>16) Splash Balls AND/OR DISK SOLD INDIVIDUALLY OR IN SETS *SH*<br>17) 4" vinyl novelty balls.<br>18) Vinyl Boxing Gloves AND/OR PUNCHING BAGS, SOLD INDIVIDUALLY OR IN SETS<br>19) Hopper Balls<br>20) Inflatable Chairs | 3(a) |
| (d) | Territory/Channels of Distribution: | | 3(b) |
| | (i) Territory: | United States, its territories and possessions, all US military bases, and Canada | |
| | (ii) Channels of Distribution: | For Licensed Articles #1 – #15:<br><br>1. Amusement<br>2. Crane<br>3. Redemption games<br><br>For Licensed Articles #16 - #20:<br><br>All Channels of Distribution | |

| | | |
|---|---|---|
| (e) Term: | | 3(c) |
| Commencement Date: | January 1, 2005 | |
| Expiration Date: | December 31, 2007 | |
| (f) Exclusive/Non-Exclusive: | Non-Exclusive | 3(a) |
| (g) Royalty Rate: | | 5(a) |
| (i) Percentage: | Eight percent (8%) of Net Sales of sales directly to consumers | |
| | Fourteen percent (14%) on all Movie Characters and Twelve percent (12%) of Net Sales in all other instances | |
| | Two percent (2%) shall be added to Royalty Rates if Licensed Articles are sold F.O.B. from a shipping point outside of the United States, except the F.O.B. percentage shall be reduced by 1% for Licensed Articles distributed by Sugar Loaf. | |
| (ii) Per Article Royalty: | N/A | |
| (h) Minimum Royalty Guarantee: | One Million Dollars ($1,000,000). | 5(b) |
| Advance: | Two Hundred Fifty Thousand Dollars ($250,000) payable upon the signing of this Agreement by Licensee. | |
| Balance: | Two Hundred Thousand Dollars ($200,000) payable on or before June 30, 2005; | |
| | Two Hundred Thousand Dollars ($200,000) payable on or December 30, 2005; | |
| | Two Hundred Thousand Dollars ($200,000) payable on or before June 30, 2006 and | |
| | One Hundred and Fifty Thousand Dollars ($150,000) payable on or before June 30, 2007. | |
| | Minimum Royalty Guarantee Allocation: | |
| | Spider-Man Classic Characters: Five Hundred and Seventy Five Thousand | |

| | |
|---|---|
| Dollars ($575,000)<br><br>Hulk Character Group: Two Hundred Thousand Dollars ($200,000).<br><br>X-Men Character Group: Forty Thousand Dollars ($40,000)<br><br>Fantastic Four Character Group: Ninety Five Thousand Dollars ($95,000)<br><br>Iron Man Character Group: Twenty Five Thousand Dollars ($25,000)<br><br>Ghost Rider Character Group: Twenty Five Thousand Dollars ($25,000).<br><br>Spider-Man and Friends Characters: Fifty Thousand Dollars ($50,000).<br><br>Daredevil Character Group, and Various Classic Character Group: Zero Dollars ($0).<br><br>Characters Groups/Spider-Man and Friends Characters/Spider-Man Classic shall not be cross collateralized, therefore Licensee shall not be entitled to credit the Minimum Royalty Guarantee due for one group against the Minimum Royalty Guarantee due for another group. For example, if the Minimum Royalty Guarantee is $600,000 for Spider-Man Classic Characters and Licensee earns $608,000 in royalties for Spider-Man Classic Characters, the excess $8000 cannot be applied to the Minimum Royalty Guarantee for the Ghost Rider Character Group. | 13(c) |
| (i)  Advertising/Promotion Commitment/Common Marketing Fund:<br><br>    (A)  Advertising/Promotion:     N/A<br><br>    (B)  CMF: N/A | |
| (j)  Mandatory Artwork Fee:       Style Guide Access at One Thousand Dollars ($1000) for the Term or the Premium D.A.M. System for Two Thousand Dollars ($2000) per year payable upon the signing of this Agreement by Licensee. | 11(a) |
| (k)  Insurance:       Combined Single Limit of $2,000,000 per occurrence. | 10(e) |
| (l)  Product Development/Submission Date:       On-going, except for Movie Characters 9 months prior to the corresponding theatrical release date. | 8(b) |
| (m) Trade Introduction Date:       On-going, except for Movie Characters 6 months prior to the corresponding theatrical | 15(d) |

Kellytoy (USA)

| | | | |
|---|---|---|---|
| | release date. | |
| (n) Consumer Introduction Marketing Date: | On-going, except for Movie Characters 3 months prior to the corresponding theatrical release date. | 15(e) |
| (o) Post-Expiration Disposal Period: | 90 Days | 16(e) |

## 2.  RECITALS

(a)  Marvel has rights in and to the names, nicknames, abbreviated names, titles, depictions, likenesses, poses, costumes, emblems, powers, characteristic concepts, themes, settings, personalities, modes of expression, phrases, pictorial and written graphics and other characteristic elements and contexts of the Characters identified in Section 1(b) hereof (excluding those utilized in motion pictures, television films and home-video versions of any thereof, unless otherwise specifically included herein) and any copyrights, trademarks, service marks and other intellectual, literary, artistic, design, moral, industrial or commercial property rights and goodwill in connection with the Characters, stories, storylines, plots, dialogue, incidents, language, artwork, symbols, designs, depictions, likenesses, formats, poses, concepts, themes and graphic, photographic and other visual representations of, relating to and associated with the Characters identified in Section 1(b) hereof (which names, characters, etc. and/or each of the individual components thereof shall hereinafter be referred to as the "**Property**"), said Property being known and recognized by the general public and associated in the public mind with Marvel.

(b)  Licensee desires to utilize the Property in the manner hereinafter described.

## 3.  GRANT OF LICENSE

(a)  Licensed Articles.  Upon the terms and conditions and with the limitations and exceptions hereinafter set forth, Marvel hereby grants to Licensee and Licensee hereby accepts the non-exclusive license right to utilize the Property but solely upon and in connection with the manufacture, promotion, sale, and distribution of the articles, products and/or services identified in Section 1(c) ("**Licensed Articles**") and in the Channels of Distribution identified in Section 1(d) (ii) ("**Channels of Distribution**").

(b)  Territory/Channels of Distribution.  The license hereby granted extends only to the Territory identified in Section 1(d) (i) and within the Channels of Distribution identified in Section 1(d)(ii) Licensee expressly acknowledges and agrees that it is not licensed or authorized to use the Property, directly or indirectly, in any other area or Channel of Distribution, and that it is not licensed to and will not knowingly sell the Licensed Articles to persons who intend or who Licensee should reasonably know are likely to resell them in any other area or Channel of Distribution, to the extent this provision is permitted by the applicable law at the time of such use, license or sale.  Licensee shall stamp on all invoices, and shall require any affiliated distributor to stamp on its invoices, a prominent legend that states that the Articles are allowed to be sold only within the Territory.  In the event that Licensee sells or exploits the Licensed Articles outside either the Territory or Channels of Distribution in violation of this Section 3(b),

Kellytoy (USA)                                                                          {00019562 SML}7

notwithstanding Sections 1(o) and 5(a), the royalty due Marvel on such sales shall be the Net Sales. In addition, in the event Licensee sells or distributes the Licensed Articles outside of the Channels of Distribution, Licensee shall pay to Marvel, a sum in the amount of three dollars ($3) per unit sold outside of the Channels of Distribution as Liquidated Damages, unless otherwise prohibited by law. The parties to this Agreement agree that a liquidated damages provision is appropriate with regard to the breach of this Section because: (a) the provisions set forth in this Section and the promises made with respect thereto are essential for the protection of the interests of Marvel and Marvel's division "Toy Biz" and the other parties to Toy Biz' agreements; (b) damages for breach of this Section would be difficult to ascertain or quantify with certainty; and (c) this sum represents a reasonable estimate of the harm likely to result to Marvel from such a breach due to such factors including, but not limited to lost business for Marvel's toy division. The parties also agree that if Licensee breaches a promise or representation made in this section, the remaining sections of this Agreement shall remain in full force and effect.

(c)    Term.    The license hereby granted shall commence on the Commencement Date and terminate automatically on the Expiration Date (the "**Term**") set forth in Section 1(e) or the expiration of any renewal as provided herein, unless sooner terminated in accordance with the provisions hereof. In the event Licensee commences any activities in connection with the Property prior to the Commencement Date, all provisions of this Agreement for the benefit and protection of Marvel shall apply in full to such activities.

(d)    Scope of License.    Notwithstanding anything contained herein to the contrary, nothing in this Agreement shall be construed to prevent Marvel from granting any other licenses for the use of the Property, in connection with the Licensed Articles, for the Territory or Channels of Distribution to which this license extends, during the Term of this license or from utilizing directly or through one or more subsidiaries and affiliates the Property in any manner whatsoever. Licensee hereby acknowledges that the aforesaid licenses or uses do not conflict with or derogate from any rights being granted to Licensee hereunder.

4.    RESERVATION OF RIGHTS

(a)    Marvel hereby reserves all rights not herein specifically granted to Licensee, including but not limited to all rights with respect to the Licensed Articles for any and all Channels of Distribution and/or delivery, including but not limited to premiums or giveaways, direct mail, electronic sales (whether made through the Internet, a commercial online service or otherwise), and vending machines and for sale at commercial venues presenting a live stage show based upon the Property such as an arena show or a touring mall show. As between the parties, such reserved rights are the sole and exclusive property of, and may be used or exercised solely by, Marvel. Any use or license by Marvel of such reserved rights, in any manner whatsoever, shall not be deemed unfair competition with, interference with, breach of or infringement of any of Licensee's rights hereunder. It is also understood that Marvel is not required to itself continue the production of the Property or any part thereof. The scope of Licensee's rights will not be considered as expanded in any respect, by implication, operation of law or any other means except by a writing in accordance with Section 19(h). All reproduction and use of the Property will accrue solely to the benefit of Marvel. All rights and interests in any derivations, adaptations, compilations, translations, titles and other versions of the Property are the exclusive property of Marvel, regardless of who created, produced or paid for such materials.

(b)    Television, etc.    Except only for the visual reproduction or presentation of the actual Licensed Articles licensed hereunder or of the actual packaging therefor or as may be expressly provided in this Agreement, Licensee shall not use the Property or the Licensed Articles identified with

the Property in connection with any manner of television, radio, motion picture, filmstrip, webcast, internet broadcast, sound and/or visual recording or transmission device or media, or anything similar to the foregoing now known or hereafter developed without Marvel's prior written approval. The name and/or likeness of any performer portraying any character included within the Property on radio, television, or in any other media or form shall not be deemed to be included in the Property, and the use thereof is not licensed.

5.     ROYALTIES, PAYMENTS, REPORTS AND RECORDS

(a)     Royalties.  Licensee agrees to pay Marvel royalties at the Royalty Rate identified in Section 1(h), determined as follows:

(i)     Royalties shall be calculated by (i) applying the Royalty Rate identified in Section 1(g)(i) to Licensee's Net Sales (defined below); or, if applicable (ii) multiplying the Minimum Per Article Royalty identified in Section 1(g)(ii) by the number of units sold by Licensee, its agents, affiliates, associates, subsidiaries or other related persons or companies ("**Related Entities**") from the sale or other exploitation of the Licensed Articles or from any use of the Property permitted hereunder, whichever yields the greater royalty payment.

(ii)     Net Sales shall mean (x) with respect to sales directly to consumers, the number of units of Licensed Articles sold directly to consumers multiplied by the highest actual retail sales price and (y) with respect to all other sales, the number of all other units sold by Licensee or its Related Entities multiplied by the actual gross invoice price of each Licensed Article, whichever is greater. Notwithstanding the foregoing, Licensee and Marvel agree that for the purposes of paying Marvel royalties: (a) when not sold to distributor: the invoice price shall be deemed to never be more than fifteen percent (15%) off of the highest actual gross invoice price of each Licensed Article and (b) when sold to a distributor: the invoice price shall be deemed to never be more than fifteen percent (15%) off of the greater of either (r) the average actual gross invoice price of each Licensed Article sold when not sold to distributor or (s) the standard price list when not sold to distributor.The price upon which the Royalty Rate is applied is referred to herein as the "**Established Price**".  The applicable Royalty Rate shall be applied to all sales by Licensee, or its Related Entities from the sale or other exploitation of the Licensed Articles or from any use of the Property permitted hereunder. No set-offs or deductions of any kind may be taken in the determination of Net Sales or the royalties due Marvel hereunder except only that:

(A) in the determination of Net Sales to all customers, other than Net Sales directly to consumers, Licensee may deduct standard trade discounts actually given and actual returns for damaged goods; provided that the total deduction for trade discounts and actual returns for damaged goods may not exceed ten percent (10%) of Licensee's total gross sales of the Licensed Articles to all customers, other than sales to consumers.

(B) in the determination of Net Sales directly to consumers, Licensee may deduct sales taxes , separately itemized shipping actually paid by consumers and returns.

(iii)     In the event that any sale or other exploitation of the Licensed Articles hereunder is made at a price lower than Licensee's Established Price for such items in the applicable Channels of Distribution, the royalty on any such sale or exploitation shall be calculated as the Established Price, regardless of whether or not Marvel has consented to such reduced price pursuant to Section 13 hereof.  Royalties as specified herein shall become due on the last day of each Quarterly Calendar Period, for all Net Sales accruing in that Calendar Period and shall be paid not later than thirty (30) days following the end of the Calendar Period, accompanied by the Royalty Report required herein. Net Sales shall be

deemed accrued for all purposes hereunder no later than ten (10) days after the invoice to which they relate is issued or the goods to which they relate are shipped, whichever is first to occur.

(b)     Advance and Minimum Royalty Guarantee.  Licensee agrees to pay Marvel the Minimum Royalty Guarantee specified in Section 1(j) as a minimum guarantee against royalties to be paid Marvel during the Term of this license.  As the first installment of the Minimum Royalty Guarantee, upon the signing hereof, Licensee shall pay Marvel the Advance specified in Section 1(h).  Any unpaid balance of said Minimum Royalty Guarantee shall be paid to Marvel as provided in Section 1(h).  No part of the Advance or Minimum Royalty Guarantee shall in any event be repayable or refundable to Licensee. Characters Groups/Spider-Man and Friends Characters/Spider-Man Classic shall not be cross collateralized, therefore Licensee shall not be entitled to credit the Minimum Royalty Guarantee due for one group against the Minimum Royalty Guarantee due for another group.  For example, if the Minimum Royalty Guarantee is $250,000 for Spider-Man Classic Characters and Licensee earns $258,000 in royalties for Spider-Man Classic Characters, the excess $8000 cannot be applied to the Minimum Royalty Guarantee for the Ghost Rider Character Group.

(c)     Currency, Wire Payment and Taxes.  All payments to Marvel shall be made in United States Dollars, shall be computed at the exchange rate existing at noon on the last business day preceding the day payment is due to be made hereunder.  All payments to Marvel shall be made via wire transfer to HSBC Bank USA, Beverly Hills, California 90210; Branch: HSBC Bank USA, 445 N. Bedford Drive, Beverly Hills, California 90210; ABA: 122240861 Account Name: Marvel Characters, Inc.; Reference: D04200 Account #: 167-710923.  If wire is to be made via SWIFT, our  SWIFT CODE: HSBCUS6L.  If payment is late, Marvel has the option to require that payment be made at the exchange rate existing on the day preceding payment.  All taxes, levies, charges or duties imposed on license rights, artwork or similar material, or payments therefor, shall be paid by Licensee and no deductions for such taxes, levies, charges or duties shall be made from amounts owed Marvel hereunder, it being the intent hereof that all royalties payable to Marvel be free and clear of any taxes, levies, charges or duties of any kind whatsoever.

(d)     Royalty Reports.  For each Calendar Period specified in Section 5(a)(iii), commencing with the end of the Calendar Period following the Commencement Date of this license and continuing until a final certification of wind-up is delivered, Licensee shall furnish Marvel with a detailed Royalty Report certified to be accurate by an authorized officer of Licensee, showing all information called for by the statement form annexed hereto as Exhibit A for each Licensed Article.  Each such Royalty Report shall be furnished to Marvel on an electronic form provided by Marvel and submitted via email to Marvel at royaltyreports@marvel.com (or any other email address provided by Marvel) within ten (10) days after the end of the Calendar Period for which such Royalty Report is made, and shall be accompanied by payment to Marvel of any and all monies due Marvel and by Licensee's most current standard price (setting forth Licensee's wholesale and suggested retail prices) for the Licensed Articles.  Such Royalty Report shall be furnished to Marvel whether or not there are any Net Sales during the preceding Calendar Period, and whether or not any monies are then due Marvel.  The failure or refusal of Licensee to timely furnish any such Royalty Report or payment shall be deemed a substantial and material breach of this Agreement and shall entitle Marvel to terminate this license as set forth in Section 15(a) hereof. The receipt or acceptance by Marvel of any of the Royalty Reports furnished pursuant to this Agreement or of any payments made hereunder (or the receipt of any wires paid hereunder) shall not preclude Marvel from questioning its accuracy at any time, and in the event that any inconsistencies or mistakes are discovered in such Royalty Reports or payments, they shall immediately be rectified and the appropriate payment made by Licensee, together with interest on any overdue payments at the rate specified in Section 17(c) hereof.

(e)     Records.  Licensee shall maintain at its expense, detailed, accurate, full and complete records and books of account covering all transactions by it relating to this Agreement at Licensee's address identified in Section 1(a), and Marvel and its duly authorized representatives shall have the right, no more than twice during each calendar year during normal business hours, and upon reasonable notice, to examine and/or audit such records and books of account and all other documents and materials in the possession or under the control of Licensee relating or pertaining to the subject matter or provisions of this Agreement and to make copies and/or extracts therefrom.  In the event that Marvel's duly authorized representatives shall discover a deficiency for any accounting period of five percent (5%) or more by any such examination and/or audit, Licensee shall pay to Marvel the cost of such examination and/or audit.  Upon Marvel's demand, but not more than once per year, Licensee shall at its own expense furnish Marvel with a detailed report by an independent certified public accountant on the accuracy and preparation of the aforesaid Royalty Reports.  Licensee shall keep all such books of account and records available to Marvel for at least two (2) years after the termination or expiration of this license.  If Licensee fails to keep and disclose such records, Marvel shall have the right to estimate, and demand payment for, such additional royalty as may be indicated owing by such trade information as may be available; Licensee, however, shall not be precluded from challenging Marvel's estimate.

6.     MARVEL'S TITLE AND GOODWILL

(a)     General. Licensee acknowledges (i) that Marvel is the owner of all right, title and interest in and to the Property, (ii) the great value of the goodwill associated with the Property, and that the Property has acquired secondary meaning in the mind of the public and (iii) that the trademarks and copyrights included in the Property, and the registrations therefor, are valid and subsisting.  Licensee further agrees that it shall not during the Term of this license or at any time thereafter dispute or contest directly or indirectly, or do or cause to be done any act which in any way contests, impairs or tends to impair Marvel's exclusive rights and title to the Property, as well as any properties owned by Marvel which are not licensed hereunder, or the validity thereof or the validity of this Agreement, and shall not assist others in so doing.

(b)     Representations of Ownership, etc.  Licensee shall not in any manner represent that it has any ownership in the Property, or in any properties owned by Marvel which are not licensed hereunder, or in any trademarks or copyrights included in the Property (or registrations therefor), but may, only during the Term of this license, and only if Licensee has complied with all laws and registration requirements within the Territory for so doing, represent that it is a "licensee" or "official licensee" hereunder.  Licensee shall not register or attempt to register any copyright or trademark in the Property, or in any properties owned by Marvel which are not licensed hereunder, in its own name or that of any third party, nor shall it assist any third party in doing so.

(c)     Use for Benefit of Marvel.  Licensee agrees that any and all uses and sales by Licensee of the Property under this Agreement shall inure to the benefit of Marvel and that neither such uses or sales nor anything contained in this Agreement shall give or assign Licensee or any other person or entity any right, title or interest in the Property, or in any properties owned by Marvel which are not licensed hereunder, except the right to use the Property specifically in accordance with the provisions of this Agreement.

7.     PROTECTION OF RIGHTS-INCLUDING COPYRIGHTS AND TRADEMARKS

(a)     General.  Licensee shall cooperate fully and in good faith with Marvel for the purpose of Marvel's securing and preserving Marvel's (or any grantor of Marvel's) rights in and to the Property.  Upon creation of Licensed Articles embodying the Property, Licensee shall be deemed to have

automatically assigned to Marvel all copyrights in the Property (and all adaptations, compilations, modifications, translations and versions thereof) embodied in the Licensed Articles. In addition, Licensee shall execute any instruments requested by Marvel to accomplish or confirm the foregoing and hereby irrevocably appoints Marvel as its attorney-in-fact to execute such instruments if Licensee does not do so.    Any such assignment shall be without consideration other than the mutual covenants and considerations of this Agreement. In order to further secure to Marvel the rights granted under Section 16(f) hereof, Licensee agrees to use reasonable efforts not to grant to any third party a security interest in, or otherwise encumber, either (i) the Licensed Articles (as inventory or otherwise) or (ii) the accounts arising out of the sale of the Licensed Articles. Licensee agrees not to grant to any third party a security interest in, or otherwise encumber, either (i) the Licensed Articles (as inventory or otherwise) or (ii) the accounts arising out of the sale of the Licensed Articles, unless prohibited by agreements with Licensee's financial institutions.    If prohibited by such agreements, Licensee shall use reasonable efforts to cause such financial institutions to adhere to the provisions relating to the disposal of the Licensed Articles contained herein.

(b)    Trademarks.    Licensee acknowledges and agrees that the names, characters, symbols, designs, likenesses, and visual representations, among other things, comprising the Property are owned by Marvel, and that Licensee shall cause to appear on everything which uses, bears or displays the Property or any part thereof, including all Licensed Articles, tags, labels and the advertising, promotional, packaging and display material therefor, a notice proclaiming and identifying the relevant portions of the Property appearing therein as properties of Marvel, as, for example, by labeling each name and character likeness with this Trademark and Copyright notice: Name(s) of character(s)] and the distinctive likeness(es) thereof are Trademarks of Marvel Characters, Inc. and are used with permission. Copyright © [year of first publication of Marvel material by Licensee, in Arabic numerals] Marvel Characters, Inc. All Rights Reserved. www.marvel.com, or otherwise as Marvel may deem appropriate.

(c)    Notice of Supervision.    Every Licensed Article and all advertising, promotional, packaging and display material therefor shall also bear this notice of supervision: This [Description of Licensed Article] is produced under license from Marvel Characters, Inc. (or an equivalent if given prior written approval by Marvel) in order to notify the public that Marvel's standards are maintained.

(d)    Reference to Source.    It is agreed that all trademarks and other references used by Licensee in connection with the Licensed Articles which might suggest that they are indicias of source, shall, with all of the goodwill relating thereto, inure to the benefit of and be the sole property of Marvel, except only that Licensee may use a house mark upon the Licensed Articles without being deemed to have assigned it to Marvel, provided it fairly appears only as Licensee's house mark.

(e)    Confusing Use.    Licensee shall not use, and shall use its best efforts to keep others with whom Licensee does business from using, the Property in any manner likely to cause confusion or doubt in the mind of the public as to the ownership and control thereof or in any manner that does not make clear that the Property is owned and controlled exclusively by Marvel. In addition, Licensee shall not use or co-mingle with the Property, and shall use its best efforts to keep others from using or co-mingling with the Property, any other trademarks, characters or properties, whether owned by Licensee or another, so as to suggest that such other trademarks, etc. may have been created or may be owned, controlled, licensed or approved by Marvel or that they are in any way related to the Property or Marvel.

(f)    Registration.    Licensee agrees to fully cooperate with and assist Marvel, at Marvel's expense, in the prosecution of any copyright, trademark or service mark applications concerning the Property that Marvel may desire to file, and for that purpose, Licensee shall, upon request, supply to Marvel enough samples of the Licensed Articles or other material as may be required in connection with

Kellytoy (USA)    {00019562 SML}12

any such application. Furthermore, Licensee shall execute any instrument Marvel shall reasonably deem necessary or desirable to record or cancel Licensee as a registered user of the trademarks of Marvel included in the Property, it being understood and agreed that Licensee's right to use the Property and the trademarks included therein in any country for which the filing of a registered user application is required, or is requested by Marvel, shall commence only upon the filing of such registered user application, but shall continue only so long as this license remains in effect.

(g)    Customer Complaints. Licensee shall, in connection with its duty to use the Property so as to promote the continuing goodwill thereof, give immediate attention and take necessary action to satisfy all legitimate customer complaints brought against Licensee in connection with the Licensed Articles or other materials using the Property. Licensee shall give Marvel immediate notice of all complaints that might affect the good standing of the Property or the reputation of Marvel and also of all complaints that might result in legal action between Marvel and any third party, and cooperate with Marvel upon request to achieve as good a reputation and press for the Property as possible.

(h)    Copyright Notice. It is a condition of this license that prior to public distribution, Licensee shall cause to appear the copyright notice specified in Section 7(b) on all Licensed Articles, tags, labels and the advertising, promotional, packaging and display materials therefor, or otherwise as Marvel may instruct in writing or approve upon request.

(i)    Secure Copyrights, etc. Marvel may secure, in its name (or the name of another, including Licensee, if desired by Marvel), to the fullest extent possible, the copyrights in the Property and the registrations, renewals and extensions thereof, embodied in the Licensed Articles, including all adaptations, translations, modifications and versions of the Property. It is also a condition of this license that all Licensed Articles and other materials produced under this Agreement shall be produced as works made for hire for Marvel.

(j)    Claims by Licensee. Licensee shall not commence any court or administrative action against Marvel or against any other licensee of Marvel under the Property without giving Marvel thirty (30) days prior written notice and an opportunity by Marvel and/or such licensee to cure or correct the matter giving rise to the proposed action during said thirty (30) day period.

8.    QUALITY OF MERCHANDISE AND SERVICES; LICENSEE NAME ON LICENSED ARTICLES

(a)    Quality of Merchandise. Licensee agrees that

(i)    the Licensed Articles shall be of a high standard and of such style, appearance and quality as shall, in the judgment of Marvel, be adequate and suited to their exploitation to the best advantage and to the protection and enhancement of the Property and the goodwill pertaining thereto;

(ii)    the Licensed Articles shall be produced, maintained, manufactured, packaged, sold, distributed, advertised and serviced in accordance with all applicable laws;

(iii)    the policy of sale, distribution, and/or exploitation by Licensee shall be of equivalent high standard and style; and that the same shall in no manner reflect adversely upon the Property or Marvel; and

(iv)    all rights granted in this Agreement shall be exploited and exercised so as not to interfere with, detract from, or alter the concepts used by Marvel or known to the public and that Licensee shall use its best efforts to preserve the concepts therein.

Kellytoy (USA)                                                                                    {00019562 SML}13

(b)    Approval of Merchandise.  Licensee specifically covenants and agrees to keep Marvel informed of its plans for use of the Property, and to consult Marvel as the Licensed Articles are being prepared, so that there will be full opportunity for Marvel to deter Licensee from any use that would alter the successful concepts associated with the Property, including any new concepts Marvel fully develops for the Property.  Licensee will consult with Marvel at every stage in designing the Licensed Articles regarding the utilization of the Characters and the Property and shall work with Marvel to obtain Marvel's creative input concerning the Characters and the Property and the overall look and direction of the Licensed Articles.  In connection therewith, Licensee shall be faithful in the portrayal of the Characters to the basic conceptualization of the Characters and the Property as well as Marvel's most current style guide for such Characters.  To this end, before the first display of any kind of the Licensed Articles or such other materials, but in no event later than the Product Development/Submission Date provided in Section 1(l), Licensee shall submit to Marvel's New York Office, to the attention of Senior Contracts Administrator, for written approval without charge, and in a form acceptable to Marvel, all rough designs, concepts and/or prototypes of each item, class, part or category of the Licensed Articles and/or with respect to any Character licensed hereunder.  All Licensed Articles shall be clearly and prominently marked "NOT FOR RESALE" (except Licensed Articles #16- #20).  After such rough material has been approved by Marvel, and before any public display, Licensee shall further submit to Marvel's New York Office, to the attention of Senior Contracts Administrator, for written approval without charge, and in a form acceptable to Marvel, a pre-production sketch or model of each item, class, part or category of the Licensed Articles and/or with respect to any Character licensed hereunder.  Any item submitted to Marvel shall be deemed disapproved unless the same shall be approved in writing within seven (7) business days of receipt of the item.  Notwithstanding the foregoing, in the event that any material submitted to Marvel shall not have been approved, disapproved or otherwise commented upon in writing by any of the following employees of the Marvel Legal Department:  Executive Vice President of Business and Legal Affairs, Assistant General Counsel, Senior Contracts Administrator, Senior Contracts Manager, or Director of Intellectual Property and Property Rights within said seven (7) business day period, then Licensee shall have the right to so notify Marvel of such fact in writing to the attention of the Marvel Legal Department clearly marking the approval form "URGENT RESUBMISSION DUE IN 5 BUSINESS DAYS OR THIS ITEM IS DEEMED APPROVED."  In the event that Marvel thereafter fails to approve, disapprove or otherwise comment upon in writing by any of the aforesaid employees of the Marvel Legal Department the submitted materials within three (3) business days after receipt of it by such communication, any such item submitted to Marvel shall be deemed approved.  If, in keeping with the aforesaid timeline, Marvel timely notifies Licensee of Marvel's disapproval of a particular item submitted by Licensee for Marvel's approval, Marvel shall specify to Licensee, in writing, the reasons for such disapproval in sufficient detail to facilitate Licensee's modification of the item in accordance with Marvel's comments.  Marvel may not disapprove any item submitted for its approval solely on the basis of Licensee's decision to use tricot fabric rather than brushed tricot fabric or Licensee's decision to use brushed tricot fabric rather than tricot fabric.  Licensee shall have thirty (30) business days from receipt of Marvel's disapproval (or approval subject to modifications) of any submission, to make such modifications as Marvel may request and to re-submit the so revised material to Marvel for its written approval.  If Licensee fails to submit the modified materials for approval within said thirty (30) business day period on three occasions, notwithstanding anything to the contrary contained in this Agreement, Marvel shall have the right to terminate this Agreement upon written notice with no cure period being required.  Licensee's failure to comply with any of the provisions of this section shall be deemed a substantial and material breach of this Agreement and shall entitle Marvel to terminate this license as set forth in Section 15(a) hereof.

(c)    Revocation of Approval.  In the event that the quality, appearance or style of any Licensed Article or Character previously approved by Marvel ceases to be acceptable to Marvel, Marvel shall have

Kellytoy (USA)                                                                                      {00019562 SML}14

the right, in its sole discretion, to withdraw its approval of such Licensed Article and to require that Licensee redesign such Licensed Article in a manner consistent with Marvel's new policies. In the event of such withdrawal, Licensee shall as soon as practicable cease the production of the previously approved Licensed Article and shall have a four (4) month sell-off period for such Licensed Article.

(d)    The Marvel logo, URL address for Marvel's website currently located at WWW.MARVEL.COM (or such other logo as Marvel designates), Marvel Comic subscription offer artwork, and a customer service toll free number shall be placed prominently on (a) outside packaging and (b) product (on product only if space permits, excluding toll free number) and Licensee's name, trade name (or a trademark of Licensee which Licensee has advised Marvel in writing that it is using) shall prominently appear on permanently affixed labeling on each Licensed Article and, if the Licensed Article is sold to the public in packaging or a container, printed on such packaging or a container so that the public can identify the supplier of the Licensed Articles. On soft goods, "permanently affixed" shall mean sewn on. On hard goods, "permanently affixed" shall mean molded into or printed on the product. On packaging, "permanently affixed" shall mean printed on the package. Licensee shall advise Marvel in writing of all trade names or trademarks it is using on Licensed Articles being sold under this license if such names or marks differ from your corporate name as indicated herein. Licensee shall also provide Marvel with all database information collected from users and consumers in connection with Licensed Articles and Licensee is required to create such database in accordance with all applicable laws so that Marvel may utilize the information at its option, including but not limited to providing consumers with an opt-in for (a) Marvel to send offers directly to such consumers and (b) allow Marvel to share this information with third parties. Licensee agrees that it shall maintain a toll-free number through which consumers can contact Licensee during normal working hours concerning the Licensed Articles.

9.    INSPECTION AND APPROVAL

(a)    Samples for Approval. The nature, quality, style and labeling of the Licensed Articles and the packaging, labels, advertising and promotional material therefor as well as any press releases or public statements involving the Licensed Articles or this License Agreement, shall have the prior written approval of Marvel. To this end, before the first sale, distribution, display or release of any kind or in any media of the Licensed Articles or such other materials, Licensee shall submit to Marvel's New York Office, Submission for approval to Marvel's New York Office or such other office(s) as Marvel may designate, the attention of BRAND ASSURANCE, for Marvel's written approval without charge, the number of samples specified herein for each Licensed Article manufactured hereunder upon completion of the first production, and each different piece of advertising, promotional, packaging and label material therefor as well as any proposed press releases or public statements involving this License Agreement (the "**Associated Material**"). Licensee shall submit to Marvel's New York Office, to the attention of: Legal Department, free of cost, for Marvel's written approval, Thirty (30) samples of the Licensed Articles upon completion of first production and *each* different piece of Associated Material therefor prior to sale or publication. Licensee shall submit thirty (30) samples of finished Licensed Article and each different piece of Associated Material annually thereafter, so long as it is being distributed by Licensee. During the Term, Licensee shall at its cost and upon Marvel's request, immediately provide Marvel with hi-resolution digital photos (via email, cd, ftp or any other reasonable method of Marvel's choosing) of each and every final Licensed Article SKU. Upon submission of each finished Licensed Article, Licensee shall submit each corresponding article's SKU number. Any item submitted to Marvel shall be deemed disapproved unless the same shall be approved in writing within seven (7) business ~~twenty (20)~~ days of receipt of the item. Notwithstanding the foregoing, in the event that any material submitted to Marvel shall not have been approved, disapproved or otherwise commented upon in writing by any of the following employees of the Marvel Legal Department: Executive Vice President of Business and Legal Affairs, Assistant General Counsel, Senior Contracts Administrator, Senior

Kellytoy (USA)                                                                                    {00019562.SML}15

Contracts Manager, or Director of Intellectual Property and Property Rights within said seven (7) business day period, then Licensee shall have the right to so notify Marvel of such fact in writing to the attention of the Marvel Legal Department clearly marking the approval form "URGENT RESUBMISSION DUE IN 5 BUSINESS DAYS OR THIS ITEM IS DEEMED APPROVED." In the event that Marvel thereafter fails to approve, disapprove or otherwise comment upon in writing by any of the aforesaid employees of the Marvel Legal Department the submitted materials within three (3) business days after receipt of it by such communication, any such item submitted to Marvel shall be deemed approved. If, in keeping with the aforesaid timeline, Marvel timely notifies Licensee of Marvel's disapproval of a particular item submitted by Licensee for Marvel's approval, Marvel shall specify to Licensee, in writing, the reasons for such disapproval in sufficient detail to facilitate Licensee's modification of the item in accordance with Marvel's comments. Marvel may not disapprove any item submitted for its approval solely on the basis of Licensee's decision to use tricot fabric rather than brushed tricot fabric or Licensee's decision to use brushed tricot fabric rather than tricot fabric. If Licensee fails to submit the modified materials for approval within said thirty (30) business day period on three occasions, Marvel shall have the right, notwithstanding anything to the contrary contained in this Agreement, to terminate this Agreement upon written notice with no cure period being required. After Licensed Articles or Associated Materials have been approved pursuant to this Agreement, Licensee shall not depart therefrom in any respect without Marvel's prior written consent. No approval of any submitted product or item by Marvel shall be construed to expand or enlarge the scope of the license granted hereunder. Licensee shall use reasonable efforts to make such changes as are reasonably requested by Marvel after an inadvertent approval or a change of conditions. In the event that this license involves the manufacture and/or sale of a food or drink product or a product intended for human use in the manner of a soap, shampoo, or a similar product, then it is an essential condition of this license, and Licensee covenants and agrees, that there shall not be the slightest departure from the quality or the formula approved by Marvel without the written consent of Marvel obtained in advance.

(b)    Inspection. Marvel or its authorized agents or representatives shall have access to Licensee's premises at all reasonable times, upon reasonable notice, with the right to a full inspection of the production of the Licensed Articles in order to satisfy itself that its standards are maintained, and with the right to be supplied, on request, with a reasonable number of free samples of all Licensed Articles in preparation and the raw materials and ingredients used therein.

(c)    Approval Limitation. Any and all approvals required by Marvel hereunder shall be valid only if in writing and signed by any of the following employees of the Marvel Legal Department: Executive Vice President Business and Legal Affairs, Assistant General Counsel, Associate Counsel, Senior Contracts Administrator, Senior Contracts Manager, Director of Intellectual Property and Property Rights or any other titles which Marvel may designate in writing. Licensee understands that no oral approval or written approval by any other employee may be relied upon or shall bind Marvel. Any reliance on any oral or written modification by any other employee shall be at Licensee's own detriment and risk.

10.    INFRINGEMENT, INDEMNIFICATION AND INSURANCE

(a)    Infringement of Property. Licensee shall promptly notify Marvel, in writing, of any imitations or infringements of the Property or the rights licensed hereunder which may come to Licensee's attention. Marvel shall have the sole right to determine whether or not any demand, suit or other action shall be taken on account of or with reference to any such infringements or imitations, and Licensee shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of Marvel to do so. Marvel, if it so desires, may commence or prosecute any suits or make any such demands at its sole expense and in its own name or in the name

of Licensee or join Licensee as a party thereto. Licensee shall cooperate with Marvel and in any manner that Marvel may request in connection with any such demands, suits, claims or other actions. Marvel, however, shall reimburse Licensee for any out of pocket expenses in so doing. If Marvel elects not to sue, Licensee may request permission to bring suit and, with written permission, may bring suit at its own expense, provided Licensee indemnifies Marvel against any loss or damage, including any loss or damage to reputation or goodwill, and provided that trial counsel is approved by Marvel, keeps Marvel fully informed, and further provided that Marvel shall have the right to assume control of the litigation at any time, but is thereupon responsible for its own further litigation expense. Nothing herein shall be construed as imposing any obligation upon Marvel to take action against any alleged infringer, nor to relieve Licensee from full compliance with any of the terms of this Agreement in the event that Marvel does not take such action.

(b)    Infringement of Other Rights. In its use of the Property, or any element or portion thereof, Licensee shall exercise reasonable care, and shall cooperate fully with Marvel, to avoid infringing any rights found to be owned by others in the Territory. Upon learning of the existence or possible existence of rights held by others which may be infringed by the use of any element or portion of the Property under this Agreement, Licensee shall promptly notify Marvel in writing.

(c)    Indemnification of Licensee. Marvel shall defend, indemnify and hold Licensee harmless of, from and against any charges, suits, damages, costs, expenses (including attorneys' fees), judgments, penalties, claims, liabilities or losses of any kind or nature whatsoever, which may be sustained or suffered by or secured against Licensee based upon or arising out of any actual or alleged trademark or copyright infringement arising solely out of the use by Licensee of the Property as authorized in this Agreement, provided that: prompt notice is given to Marvel of any such claims or suits and provided further that: Marvel shall have the option to undertake and conduct the defense and/or settlement of any such claims or suits and that Licensee cooperates with Marvel in the defense of any such claims or suits and Licensee acts to mitigate any damages, and that no settlement of any such claims or suits is made without the prior written consent of Marvel. Marvel does not warrant any present or future commercial value of the Property.

(d)    Indemnification of Marvel. Licensee shall defend, indemnify and hold Marvel, its parents, subsidiaries, associated and affiliated companies, harmless of, from and against any charges, suits, damages, costs, expenses (including attorneys' fees), judgments, penalties, claims, liabilities or losses of any kind or nature whatsoever, which may be sustained or suffered by or secured against Marvel in connection with the Licensed Articles, or based upon or arising out of any actual or alleged unauthorized use of any patent, trade secret, process, idea, method or device, or any copyright or trademark, other than under this license, or the packaging, distribution, promotion, sale or exploitation of the Licensed Articles, any actual or alleged defect in the Licensed Articles or their packaging, whether latent or patent, including failure of said Licensed Articles or their packaging, distribution, promotion, sale or exploitation to meet any Federal, State or local, or other applicable laws or standards; or any other actual or alleged unauthorized action of Licensee, including a breach of any term of this Agreement.

(e)    Insurance. Licensee shall obtain at its own expense and maintain during the Term of this Agreement and for three (3) years thereafter, general liability insurance including advertising, blanket contractual, product liability and completed operations liability coverages. In the event the Licensed Articles are books or other published materials or of an electronic nature such as software, computer programs, etc., Licensee also shall obtain at its own expense and maintain during the Term of this Agreement and for three (3) years thereafter (five (5) years if the policy form is claims made) multi-media liability insurance which provides coverage for claims arising out of the published material and shall include but not be limited to the allegations of defamation, copyright infringement, invasion of right of

Kellytoy (USA)                                                                    {00019562 SML}17

privacy, or other personal injury and breach of implied contract. All insurance must be provided by a recognized insurance company having a Best's Rating of no less than "A" providing adequate protection at least in the amounts specified in Section 1(k) for personal bodily injury and property damage for Marvel and also for Licensee. Said insurance shall be primary and non-contributory with respect to any insurance carried by Marvel. *Upon return to Marvel of Licensee's signed originals of this Agreement, Licensee shall furnish to Marvel's New York Office, to the attention of Senior Contracts Administrator, a certificate evidencing that such insurance is in force, naming Marvel its subsidiaries, associated and affiliated companies as additional insured parties and providing that such coverage will not be canceled without at least thirty (30) days notice to Marvel.* Failure to provide the insurance certificate shall result in termination as per Section 15(f). *Said insurance coverage shall be effective as of the date first written above.* Any proposed change in the insurance policy(ies) affecting Marvel's coverage shall be submitted for review as to the policy compliance with the terms and conditions of this Agreement, to Marvel's New York Office, to the attention of Senior Contracts Administrator. The policy(ies) of insurance must be non-cancelable except after thirty (30) days prior written notice to Marvel's New York Office, sent to the attention of Senior Contracts Administrator. As used in Section 10(b) and (d), "Marvel" shall also include the agents, employees, assignees and any sponsor of Marvel, any advertising agency, and their respective officers, directors, agents and employees. This provision shall survive the termination or expiration of this Agreement. Notwithstanding anything herein to the contrary, in the event that Licensee is not able to obtain, or fails to maintain any of the insurance coverages in the amounts contemplated by this Section 10(e), Licensee shall defend, indemnify, and hold Marvel, its parents, subsidiaries and affiliates harmless of, from and against any charges, suits, damages, costs, expenses (including attorneys' fees), judgments, penalties, claims, liabilities or losses of any kind or nature whatsoever which may be sustained or suffered by or secured against Marvel or any affiliate thereof based on or arising out of the failure of Licensee to obtain or maintain any of the insurance coverages in the amounts contemplated by this Section 10.

11.    ARTWORK

(a)    Licensee may request from Marvel limited amounts of artwork from the Marvel's multiple online style guides for each character group licensed hereunder (the "Marvel Online Style Guides") depicting the Property for use in the Licensed Articles for the mandatory fees specified in Section 1(j). Licensee may alternatively request access to Marvel's premium art database via the internet, (the "Premium D.A.M. System") for the Premium D.A.M. System fee as specified in Section 1(j). The cost of providing copies of additional artwork, and the cost of both producing and providing copies of additional artwork, other than Style Guide artwork and Premium D.A.M. System artwork (if Licensee chooses this option), which is specifically requested by and specifically prepared for Licensee or the reproduction thereof shall be paid by Licensee upon invoicing therefor. Licensee understands that in the event any fees or royalties are due creators or artists as a result of certain artwork or story-lines, Licensee shall be responsible for the payment of such fees and/or royalties upon invoicing therefor. Payment of artwork and any fees associated therewith shall not be credited against any guarantee or other amount due Marvel. All invoices for artwork shall be paid by Licensee within thirty (30) days of receipt. The failure or refusal of Licensee to timely furnish any such payment shall be deemed a substantial and material breach of this Agreement and shall entitle Marvel to terminate this license as set forth in Section 15(f) hereof. During the Term, Licensee shall at its cost and upon Marvel's request, immediately provide Marvel a CD with any Property based hi-resolution artwork created by Licensee.

(b)    All artwork involving the Property, or any reproduction thereof, and all copyrights therein shall, notwithstanding its use by Licensee, be and remain solely the property of Marvel and Marvel shall be entitled to use the same and to license the use of the same by others. Any reproduction or use of such artwork shall be on a non-exclusive basis.

(c)    Licensee shall obtain and promptly furnish to Marvel's New York Office, sent to the attention of Senior Contracts Administrator, on the form annexed hereto as Exhibit B, an Agreement signed by each person who creates, prepares or produces for or on behalf of Licensee (whether as an employee, an independent contractor or otherwise) any artwork involving the Property or any reproduction thereof, stating that such artwork is a work made for hire for Licensee under the U.S. Copyright Laws and acknowledging that such person has no copyright or other rights of any kind in or to such artwork. Licensee shall be deemed to have automatically assigned to Marvel all copyrights in any materials created by or for Licensee in the licensed articles. Further, Licensee shall execute any instruments requested by Marvel to accomplish or confirm the foregoing assignment, and hereby irrevocably appoints Marvel as its attorney-in-fact to execute such instruments if Licensee does not do so.

## 12.    PROMOTION

Marvel shall have the right, but shall not be under any obligation, to use the Property and/or the name of Licensee so as to give the Property, Licensee, Marvel and/or programs connected with the Property full and favorable prominence and publicity. If the Licensed Articles appear in film produced by or under authority of Marvel, there shall be no obligation by Marvel to discontinue use of such film or any part thereof at the expiration or termination of this license and such continued use shall in no way be construed as an extension of the Term hereof or of this license.

## 13.    DISTRIBUTION AND ADVERTISING

(a)    Licensee shall diligently and continuously use its best efforts throughout the entire Territory licensed hereunder and during the entire Term of this license to distribute solely through the Channels of Distribution identified in Section 1(d)(ii) and sell the Licensed Articles, to make and maintain adequate arrangements for the distribution of the Licensed Articles, to promote and expand its sales hereunder to achieve the highest Net Sales practicably obtainable and to compete with any similar businesses, products or services. Licensee shall sell and distribute the Licensed Articles at a competitive price and not on an approval, tie-in, consignment or 'sale or return' basis, and only to jobbers, wholesalers and distributors for sale and distribution to the Channel of Distributions stated with all Licensed Articles clearly and prominently marked as "NOT FOR RESALE" (except Licensed Articles #16- #20). For the avoidance of doubt, the "NOT FOR RESALE" marking is intended for the consumers, not for the distributors.

(b)    Licensee acknowledges that it has no right to and shall not, without prior written consent of Marvel, sell or distribute the Licensed Articles to anyone whose sales or distribution are or will be made for publicity, promotional or tie-in purposes, combination sales, premiums, giveaways, by direct mail, electronic sales (whether made through the Internet, a commercial online service or otherwise) or similar methods of merchandising, or whose business methods are or are reported to be questionable. Licensee shall not sell any of the Licensed Articles at a price twenty-five percent (25%) or more below the Established Price for such Licensed Article, without obtaining Marvel's prior written consent, it being recognized that sales below such amount will result in disparagement of the Licensed Articles and/or Marvel.

## 14.    SALE TO MARVEL

(a)    Licensee agrees to sell to Marvel a reasonable quantity of the Licensed Articles not to exceed 200 units per SKU at Licensee's cost for such Licensed Articles, and shall deliver the Licensed Articles to Marvel at Marvel's expense, and in any quantity Marvel orders, provided that (i) the Licensed Articles so purchased shall not be resold by Marvel and (ii) the Licensed Articles so purchased shall be on a royalty-free basis. In the event Marvel wishes to purchase more than 200 units of a SKU, Licensee shall offer them to Marvel at Licensee's lowest wholesale selling price offered to Licensee's customers.

(b)    In the event Marvel wishes to purchase the Licensed Articles for resale purposes, Licensee shall sell to Marvel the Licensed Articles in any quantity Marvel desires at no greater than Licensee's lowest wholesale selling price offered to third parties for such quantities, and Licensee shall pay royalties on all such sales to Marvel in accordance with the provisions hereof.

## 15.   TERMINATION

(a)    In the event of failure by Licensee to furnish the royalty payments and/or Royalty Reports required hereunder in accordance with Section 5 hereof or to timely pay the Minimum Royalty Guarantee payments in accordance with Section 5 of the Agreement or pay invoices in accordance with Section 11 and 13 of the Agreement, Marvel shall have the right to terminate this license upon fifteen (15) days' notice in writing, and such notice of termination shall become effective unless, within such fifteen (15) day period, Licensee shall completely remedy the breach and furnish the required payments and/or Royalty Reports. Notwithstanding the foregoing, if Licensee fails to furnish the required payments and/or Royalty Reports more than twice within an eighteen (18) month period, Marvel shall have the right to terminate this Agreement immediately. In the event Licensee fails to submit samples prior to production or sale of the Licensed Articles or the distribution of associated articles in accordance with Section 9(a) hereof, or failure by Licensee to obtain Marvel's written approval of the samples submitted by Licensee in accordance with Section 9 hereof, this Agreement will automatically terminate with no prior notice to Licensee being required.

(b)    Marvel shall have the right to terminate this Agreement upon ten (10) days prior notice upon the occurrence of any of the following events:

(i)    If Licensee shall become insolvent or fail to pay its debts and obligations on a current basis or shall make an assignment for the benefit of creditors or become involved in a voluntary receivership, bankruptcy or other insolvency or debtor relief proceedings, or an involuntary receivership, bankruptcy or other involuntary insolvency or debtor relief proceeding that is not discharged within 60 days or any similar proceedings, or in proceedings, voluntary or forced whereby it is limited in the free and unrestrained exercise of its own judgment as to the carrying out of the terms of this Agreement;

(ii)    if Licensee shall cease to do business;

(iii)    if Licensee shall attempt to assign any of its rights under this Agreement except pursuant to Section 19 (f). For purposes of this Agreement, a merger or consolidation of Licensee with another person or entity, other than its parent or a wholly owned subsidiary, shall be deemed an assignment of this Agreement; however, Licensee may assign as per Section 19(f).

(iv)    in the event that a term of this Agreement is held invalid or unenforceable by the determination of any government or any court of competent jurisdiction; however, in the event such term is only held invalid in a portion of the Territory, such termination shall only apply in the portion of the Territory in which such term is held invalid or unenforceable.

(v)    if any Licensed Articles become the subject of a recall by the Federal Consumer Product Safety Commission or any corresponding state or federal agency and Licensee fails to take immediate action to recall such products; or

(vi)    if, in Marvel's reasonable opinion, Licensee's ability to perform under this Agreement is or will be impaired due to Licensee's financial inability to comply with its anticipated obligations under this Agreement.

(c)    Change in Character of Licensee. It is understood that the grant of the license herein by Marvel is premised upon the present character and composition of Licensee's management and Licensee's general good standing and reputation in the business community, and are therefore personal to Licensee. Excluding changes within the Kelly family from one immediate family member to another immediate family member, Marvel may terminate this Agreement if: (i) there is a transfer, in a single transaction or a series of transactions of twenty-five percent (25%) or more of (a) the then outstanding shares of common capital stock of Licensee or its "Parent" (as defined below) or (b) the combined voting power of the then outstanding voting securities of the Licensee or its Parent entitled to vote generally in the election of directors; or (ii) there is a transfer, in a single transaction or a series of transactions, of all or substantially all of the assets of Licensee or its Parent (in each instance, a "Change of Control"). If Licensee has reason to believe that such a Change of Control has occurred or will occur in the reasonably foreseeable future or if Licensee or its Parent proposes to enter into such a Change of Control transaction, Licensee shall give written notice thereof to Marvel. Within a ten (10) business days after receiving such notice, Marvel shall give Licensee written notice stating whether it approves or disapproves any such Change of Control or proposed Change of Control and, in the case of its disapproval thereof, whether it exercises its right of termination hereunder, if the Change of Control has already occurred, or will exercise its rights of termination if the proposed Change of Control is subsequently made. If Marvel approves of such Change of Control and such Change of Control actually occurs, a transfer fee will be immediately payable to Marvel in such an amount as Marvel may determine [but in no case greater than $100,000, based upon such factors including, but not limited to: the Licensed Articles, the Minimum Royalty Guarantee, the royalty rate and the amount of the remaining Term. This fee will represent consideration to Marvel for, among other issues, Marvel's risk that sales or production may be delayed, approval and supervision of the use of the Property may be compromised, the possible risk associated with the new identity, relationships, credit standing, capabilities, and image associated with a new or altered Licensee, and Marvel's administrative expenses. The foregoing shall not limit in any way the right of Marvel, under Section 19(f), to disapprove assignments and other transfers of this Agreement and the rights hereunder. For purposes of this Section 15(c), Licensee's "Parent" shall mean any person or entity in control of Licensee directly or indirectly through one or more intermediaries.

(d)    Trade Introduction. In the event of failure by Licensee to introduce the Licensed Articles to retail accounts constituting a majority of Licensee's anticipated Net Sales by the Trade Introduction Date provided in Section 1(m), Marvel shall have the right to terminate this license upon thirty (30) days notice in writing, and such notice of termination shall become effective unless, within said thirty (30) day period, Licensee shall remedy the violation and comply with all conditions, and reasonably satisfy Marvel that it has done so.

(e)    Diligent Distribution. If within nine (9) months of obtaining approval from Marvel to manufacture and distribute a particular character or characters of the Licensed Articles, or thereafter if in any twelve (12) consecutive months, Licensee fails to manufacture and sell five thousand (5,000) units of that item, Marvel, in addition to all other options and remedies available to it hereunder, may

terminate this license on fifteen (15) days written notice with respect to any such item or items. Such notice shall be effective when mailed to Licensee with no prior notice to Licensee being required.

(f)    Other Breach.  Except as otherwise specifically set forth in this Agreement, if Licensee shall violate, breach or be in default of any of its covenants or obligations under this Agreement or shall use bad faith in carrying out the provisions of this Agreement, Marvel, in addition to all other rights, also shall have the right to terminate this license upon thirty (30) days written notice, and such notice of termination shall become effective within said thirty (30) day period, unless Licensee shall completely remedy the violation and satisfy Marvel that all reasonable steps have been taken to prevent reoccurrence.

(g)    Other Licenses, Agreements and Properties.  Licensee acknowledges and agrees that if Licensee violates any of its obligations under this Agreement, Marvel shall have the right to terminate any other License Agreement with Licensee (or any affiliate of Licensee).  In addition, Licensee acknowledges and agrees that if Licensee violates its obligations under any other agreement (including, but not limited to invoices, payments, purchases or any other obligations) between Marvel and Licensee (or any affiliate of Licensee), or if Licensee (or any affiliate of Licensee) uses the Property or any part thereof beyond the scope of the license granted herein or uses any properties owned by Marvel which are not licensed to Licensee, Marvel shall have the right to terminate this License Agreement. In either event, Marvel's right to terminate shall be effective upon twenty (20) days notice in writing and such notice shall become effective unless Licensee shall completely remedy the violation within the ten (10) day period and satisfy Marvel that such violation has been remedied.

16.    OBLIGATIONS ON EXPIRATION OR TERMINATION

(a)    Reversion of Right.  Immediately upon the expiration or termination of this license for any cause whatsoever, all the rights granted to Licensee hereunder shall cease and revert to Marvel, who shall be free to license others to use any or all of the rights granted herein effective on and after such date of expiration or termination.  To this end, Licensee will be deemed to have automatically assigned to Marvel upon such expiration or termination, all copyrights, trademark and service mark rights, equities, good will, titles and other rights in or to the Property and all adaptations, compilations, modifications, translations and versions thereof, and (except for Licensee's house mark) all other trademarks and service marks used in connection therewith which have been or may be obtained by Licensee or which may vest in Licensee and which have not already been assigned to Marvel. Licensee shall upon the expiration or termination of this license execute any instruments requested by Marvel to accomplish or confirm the foregoing, and hereby irrevocably appoints Marvel as its attorney-in-fact to execute such instruments if Licensee does not do so.  Any such assignment shall be without other consideration than the mutual covenants and considerations of this Agreement.  In addition, upon and after such expiration or termination of this license for whatever reasons, Licensee will, except as specifically provided in Section 16(e) hereof, forthwith refrain from further use of the Property or Marvel's name, or any further reference to any of them, direct or indirect, or of anything deemed by Marvel to be similar to the Property.

(b)    Return of Artwork.  Upon termination or expiration of this Agreement for any reason whatsoever, Licensee shall return to Marvel's New York Office, sent to the attention of Senior Contracts Administrator, all artwork, including but not limited to all reproductions and all artwork specially produced for Licensee by Marvel or others, whether or not paid for by Licensee.

(c)    No Release.  The termination or expiration of this license shall not release any party of any obligation to pay any monies that became due or owing or arose out of any transaction prior to the date

Kellytoy (USA)                                                                              {00019562 SML}22

of termination or expiration, and all royalties on sales or shipments theretofore made shall become immediately due and payable with no part of the Minimum Royalty Guarantee being repayable, and any balances of the Minimum Royalty Guarantee owed to Marvel shall be immediately due and payable.

(d)    Inventory. Fifteen (15) days before the expiration of this license and, in the event of its termination, fifteen (15) days after receipt of notice of termination or the happening of the event which terminates this license where no notice is required, a statement executed by an officer of Licensee certifying the number and description of the Licensed Articles in inventory or in process shall be furnished by Licensee to Marvel's New York Office to the attention of Senior Contracts Administrator. Marvel shall have the right to take a physical inventory to ascertain or verify such inventory and statement, and Licensee's failure to furnish such statement or the refusal by Licensee to submit to such physical inventory shall forfeit Licensee's right to dispose of such Licensed Articles as provided in Section 16(e) hereof.

(e)    Disposal. After expiration of this license, for the Post-Expiration Disposal Period specified in Section 1(o), Licensee may, except as otherwise provided in this Agreement, dispose of, on a nonexclusive basis, and in compliance with all of the terms and conditions hereof, including Section 13, those Licensed Articles which are on hand or in process at expiration, provided royalties with respect to such Calendar Period are paid and Royalty Reports are furnished for such Calendar Period in accordance with Section 5 hereof. Royalties on Net Sales during the Disposal Period may not be applied against any unearned balance of the Minimum Royalty Guarantee. Licensee shall not be authorized to dispose of the excess inventory in the Disposal Period to the extent that it exceeds ten percent (10%) of the total number of Licensed Articles sold during the twelve (12) month period immediately prior to the Expiration Date without Marvel's prior written consent. Notwithstanding anything to the contrary herein, Licensee shall not sell or dispose of any Licensed Articles after termination of this Agreement pursuant to Section 15. In the event that Licensee sells or exploits the Licensed Articles after the Post-Expiration Disposal Period the royalty due Marvel on such sales shall be the Net Sales.

(f)    Undisposed Licensed Articles. Upon expiration or termination of this license, or upon the expiration of the period for disposal where permitted under the previous subsection, title to all remaining Licensed Articles, if any, and all tags, labels, packaging, advertising, promotional, and display materials therefor, and all molds, plates, engravings and/or mechanicals used to make any of the Licensed Articles or any of the aforesaid materials, shall be deemed to have automatically vested in Marvel. Licensee shall immediately deliver such remaining Licensed Articles, materials, and items to Marvel's New York Office, to the attention of Senior Contracts Administrator, at no expense to Marvel, and Marvel shall have the right to enter the business premises of Licensee and take possession of them or Licensee shall destroy such Licensed Articles, materials and items if so requested by Marvel, and shall furnish Marvel's New York Office, sent to the attention of Senior Contracts Administrator, with a certificate of destruction executed by an officer of Licensee.

17.    REMEDIES

(a)    General. In addition to the right to terminate, Marvel may, upon any default by Licensee, take whatever action it deems reasonably necessary to protect its rights and interests hereunder, and termination of this license shall be without prejudice to any rights or remedies which Marvel may otherwise have against Licensee.

(b)    Use after Termination, etc. Licensee acknowledges that its failure to cease the use of the Property or to cease sale or distribution of the Licensed Articles at the termination or expiration of this license, except as expressly provided herein, will result in immediate and irreparable damage to Marvel

and to the rights of any subsequent licensee. Licensee acknowledges and admits that there is no adequate remedy at law for such failure, and Licensee agrees that in the event of such failure, Marvel shall be entitled to injunctive relief and such other and further relief as any court with jurisdiction may deem just and proper.

(c)     Interest, Damages and Cost. In the event Licensee shall default in the payment of monies required to be paid to Marvel hereunder, in addition to any remedies which Marvel may have at law or in equity to recover any such monies as may be due and owing, Marvel shall be entitled to receive from Licensee interest on such monies as may be owing from the date of default at a rate equal to three percent (3%) above the prime lending rate charged by Marvel's bank in New York on the date of default. In the event that Licensee is in breach or default hereof, then Licensee shall be responsible for the damages and expenses caused Marvel thereby, including attorneys' fees, incurred by Marvel to enforce any of its rights hereunder, such as, for example, the seeking of a temporary restraining order or an injunction, or the obtaining of damages.

## 18.    SUBCONTRACT MANUFACTURE

Licensee may utilize a third party subcontract manufacturer approved in writing by Marvel in connection with the manufacture and production of the Licensed Articles, provided that such subcontractor shall execute a letter in the form of Exhibit C attached hereto and by this reference made a part hereof. In such event, Licensee shall remain primarily obligated under all of the provisions of this Agreement. In no event shall any such subcontract manufacturer Agreement include the right to grant any further sublicenses.

## 19.    GENERAL

(a)     Integrity of Agreement. This Agreement contains and embodies the entire Agreement and understanding of the parties concerning the subject matter hereof. No warranties, representations, understandings, inducements, promises, guarantees, agreements or conditions, express or implied, not expressly contained herein, have been made or shall be enforceable by either party concerning the subject matter hereof or any relationship between the parties. Nothing contained herein shall be deemed an express or implied warranty on the part of Marvel that efforts to gain copyright, trademark or service mark registration will be successful, or that the Property has or will in the future have any commercial value, and it is understood that no liability shall attach to Marvel for any failure to secure such registration, nor shall there be any modification hereof for such reason.

(b)     Relationship Between the Parties. The relationship between the parties hereto is that of licensor and licensee, and this Agreement is not to be construed as creating a partnership, joint venture, master-servant, principal-agent, or other relationship for any purpose whatsoever. Except as may be expressly provided herein, neither party may be held for the acts either of omission or commission of the other party, and neither party is authorized to or has the power to obligate or bind the other party by contract, Agreement, warranty, representation or otherwise in any manner whatsoever.

(c)     Force Majeure. Licensee and Marvel shall be released from their obligations hereunder and this license shall terminate with respect to such territory, field or part thereof as to which governmental regulations or other causes arising out of a state of national emergency renders performance impossible, for a period of more than ninety (90) days, and one party so informs the other in writing of such causes and its desire to be released. In such event, all royalties on sales theretofore made with respect to such territory, field or part shall become immediately due and payable to Marvel. In addition, the Minimum Royalty Guarantee, prorated until the time of termination, or all Advance and

Kellytoy (USA)                                                                {00019562.SML}24

Minimum Royalty Guarantee payments made to Marvel as of the date of the Force Majeure event shall become retained or become due and/or payable, as applicable, to Marvel. No part of the aforementioned payments shall be repayable to Licensee.

(d)     Mailing Addresses. All notices, reports and statements to be given and all payments to be made hereunder, shall be given or made by hand delivery, email, first class, Registered or Certified mail, or Federal Express or any overnight delivery service providing notice of receipt at the respective addresses of the parties as set forth above (notice to Marvel shall be to the attention of Marvel's legal department), unless notification of a change of address is given in writing, and the date of delivery on applicable tracking information for Federal Express or any overnight delivery service providing notice of receipt shall be deemed the date the notice, report or statement is given (three (3) days after the date of mailing by first class, Registered or Certified mail, as post-marked shall be deemed the date the notice, report or statement is given). The mailing of a notice by Registered or Certified mail shall constitute notice hereunder even in the event of refusal to accept by addressee.

(e)     Survival and Separability. Notwithstanding anything to the contrary herein, all provisions hereof are hereby limited to the extent mandated by any applicable law or decisions. If any one or more paragraphs, clauses or other portions hereof should ever be determined to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction or be illegal, invalid or invalidated or unenforceable within any jurisdiction by reason of any existing law or statute, then to that extent and within the jurisdiction in which it is illegal, invalid or unenforceable it shall be limited, construed or severed and deleted herefrom, and the remaining extent and/or remaining portions hereof shall survive, remain in full force and effect and continue to be binding and shall not be affected except insofar as may be necessary to make sense hereof, and shall be interpreted to give effect to the intention of the parties insofar as that is possible.

(f)     Assignment or Sublicense. This Agreement and the license rights granted hereunder are personal to Licensee and shall not in any manner whatsoever be assigned (except within the immediate Kelly family due to changes in family ownership),sublicensed, hypothecated, mortgaged, divided or otherwise encumbered by Licensee to or with any other person or entity without Marvel's prior written consent which it may withhold in its sole discretion but no such assignment by Licensee shall release Licensee from any of its obligations or liabilities hereunder. This Agreement and the provisions hereof shall be binding at all times upon and inure to the benefit of the parties hereto, their successors and permitted assigns. Any attempted assignment in violation of the provisions hereof shall be void ab initio and the assignee shall obtain no rights by reason thereof.

(g)     Construction and Jurisdiction. This Agreement shall be construed and interpreted in accordance with the laws of the State of New York applying to contracts fully executed and performed in New York. Licensee agrees to submit to exclusive jurisdiction in the courts (both Federal and State) of New York State for any action brought by Marvel or Licensee hereunder, to bring no action in any other Court, and Licensee further agrees to accept service of process by mail at its above written address, and Licensee also designates the Secretary of State of New York and the state of Licensee's incorporation to accept service of process by mail on behalf of Licensee. The titles and headings of the sections, subsections and other divisions of this Agreement are inserted merely for convenience and identification and shall not be used or relied upon in connection with the construction or interpretation of this Agreement.

(h)     No Waiver. None of the provisions hereof shall be deemed to be waived or modified, nor shall they be renewed, extended, altered, changed or modified in any respect except by an express agreement in writing duly executed by the party against whom enforcement of such waiver, modification,

Kellytoy (USA)                                                                                    {00019562.SML}25

etc. is sought. The failure of either party hereto to object to the failure on the part of the other party to perform any of the terms, provisions or conditions hereof or to exercise any option herein given or to require performance on the part of the other party of any term, provision or condition hereof, or any delay in doing so, or any custom or practice of the parties at variance therewith, shall not constitute a waiver or modification hereof or of any subsequent breach or default of the same or a different nature, nor affect the validity of any part hereof, nor the right of either party thereafter to enforce the same, nor constitute a novation or laches.

(i)      Ethics.  Licensee agrees that no part of the consideration paid pursuant to this Agreement shall be offered, paid or payable, directly or indirectly, to any governmental official, political party or official thereof, or any candidate for political office, for the purpose of influencing any act or decision of such person or party or inducing such person or party to use his or its influence to affect or influence any act or decision of any national, state or local government or instrumentality thereof.  For the purposes of this Section (i), the term "governmental official" shall include any officer or employee of a national, state or local government, or any department, agency or instrumentality thereof, or any person acting in an official capacity of or on behalf of such government or department, agency or instrumentality.

(j) Prevailing Languages. In the event of any conflict of interpretation between this Agreement and any translation, the original English version shall prevail.

20.   WAIVER OF JURY TRIAL

LICENSEE HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY SUMMARY OR OTHER ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, AND ANY CLAIM FOR INJURY OR DAMAGES.

IN WITNESS WHEREOF, and intending to be legally bound thereby the parties hereto have caused this instrument to be duly executed as of the day and year first above written.

MARVEL CHARACTERS, INC./MARVEL ENTERPRISES, INC.

By: _____
Name: John Turitzin
Title: Vice President
Date: 1/3/05

KELLYTOY (USA)

By: Jonathan S. Kelly
Name: JONATHAN KELLY
Title: V.P.
Date: 12-22-04

{00019562 SML}27

Attachments:

➤ Exhibit A: Royalty Report Form
➤ Exhibit B: Work Made For Hire Letter Form
➤ Exhibit C: Subcontract Manufacturer Letter Form

EXHIBIT A

Accounting statements with Royalties shall be sent via wire transfer to: HSBC Bank USA, Beverly Hills, California 90210; Branch: HSBC Bank USA, 445 N. Bedford Drive, Beverly Hills, California 90210; ABA: 122240861 Account Name: Marvel Characters, Inc.; Reference: D04200 Account #: 167-710923. If wire is to be made via SWIFT, our SWIFT CODE: HSBCUS6L; with a copy of reports to Accounts Receivable, Marvel Enterprises, Inc., 10 East 40th Street, New York, NY 10016 (Marvel's New York Office).

**MARVEL CHARACTERS, INC. ROYALTY REPORT**

Contract #:    D04200

Licensee Name:

Contact Person:                          All Character Codes:

Phone Number:

Fax Number:                              Period Covered: From:                To:

**ROYALTY INFORMATION**

| SKU # | Article Descrip. | Character | Territory | Movie/TV Series/ Comic Book | Units Sold | Unit Price By Item | Gross Sales | Less Actual Deductions | Net Sales | Merch. Royalty% | CMF Royalty% (If Applicable) | Merch. Royalty | Exchange Rate | Merchandise Royalty Earned (USD) | CMF Royalty Earned (If Applicable) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  | **Total Royalties Earned** |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  | **Less Unrecouped Advance** |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  | **Balance Due Marvel** |  |  |  |

Prepared By:

_____ (please print)

Check enclosed for $ _____

Wire of sent on (date): _____ In the amount of $ _____
PLEASE WIRE PAYMENT TO:
Marvel Characters, Inc.
PO Box 2631
Buffalo, NY 14240-2631

REMIT COPY OF WIRE RECEIPT TO:
Accounts Receivable
Marvel Enterprises, Inc.
10 East 40th Street, New York, NY 10016

Kellytoy (USA)

{00019562 SMfL}29

Exhibit B                                    D04200

AMENDMENT made this _____ day of _____, 200___, between

_____

residing at_____

(herein "Supplier") and _____

residing at _____ (herein "Licensee").

Licensee has been licensed by Marvel Characters, Inc. (herein "Marvel") to produce and/or market certain merchandise based upon and utilizing literary and/or artistic properties owned by Marvel. Supplier wishes to have Licensee order or commission either written material or art work as a contribution to a collective Work to be used by Licensee pursuant to the license from Marvel. Marvel has informed Licensee that Marvel will permit the preparation of such written material or art work only if it is commissioned on a work made-for-hire basis.

THEREFORE, the parties agree as follows:

In consideration of Licensee's commissioning and ordering from Supplier written material or art work and paying therefor, Supplier acknowledges, agrees and confirms that any and all work, writing, art work material or services, including all notes, sketches, drafts, etc. therefor (the "Work") which have been or are in the future created, prepared or performed by or on behalf of Supplier for Licensee involving, based upon, utilizing, derived from, incorporating or referring to any properties, characters or materials of Marvel have been and will be specially ordered or commissioned for use as a contribution to a collective work; that the Work was produced under the supervision and control and pursuant to the direction of Licensee; and that as such, the Work was and is expressly agreed to be considered a work made for hire pursuant to all copyright laws applicable to the Work.

Supplier expressly grants to Licensee forever all worldwide rights of any kind and nature in and to the Work and agrees that as between Supplier and Licensee, Licensee is the sole and exclusive copyright proprietor thereof throughout the world. Supplier perpetually agrees (i) not to contest Licensee's or Marvel's exclusive, complete and unrestricted ownership in and to the Work, (ii) not to claim any ownership in the Work; (iii) not to use or exploit or claim the right to use or exploit the Work in any manner; and (iv) not to object to any exploitation or use of the Work or to any changes, modifications, or revisions to the Work made by or on behalf of Licensee or Marvel, and Supplier hereby waives any moral rights of any kind or nature in the Work.

Kellytoy (USA)                                           {00019562 SML}30

This Agreement shall be binding upon and inure to the benefit of the parties hereto and to the benefit of Marvel, and their respective heirs, successors, administrators and assigns.

In WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Supplier:                                    Licensee:

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

Kellytoy (USA)                                              {00019562 SML}31

Exhibit C                D04200

Dated

Marvel Characters, Inc.
c/o Marvel Enterprises, Inc.
10 East 40th Street
New York, NY 10016

This letter will serve as notice to you that pursuant to Section 18 of the License Agreement dated between you and          , we have been engaged as the subcontract manufacturer for          in connection with the manufacture of the Licensed Articles defined in the aforesaid License Agreement. We hereby acknowledge that we have received a copy and are cognizant of the terms and conditions set forth in said License Agreement and hereby agree to be bound by those provisions of said License Agreement which are applicable to our function as manufacturer of the Licensed Articles, including but not limited to the right of Marvel, pursuant to Section 5(e) of the License Agreement, to examine our Books of Account Records with respect to the manufacture of the Licensed Articles. It is understood that this engagement as subcontract manufacturer is on a royalty-free basis, and that we have no right to sublicense or subcontract thereunder.

We understand that our engagement as the subcontract manufacturer for          is subject to your approval. We request, therefore, that you sign in the space below, thereby showing your acceptance of our engagement as aforesaid.

Very truly yours,

        (Manufacturer)

By:

Name:

Title:

Date:


Accepted:

Marvel Characters, Inc.

By:

Name:

Title:

Date:

Kellytoy (USA)                                                                                                    {00019562 SML}32

D04200-1 

**AMENDMENT**
**TO**
**LICENSE AGREEMENT**

This amendment ("Amendment") when executed by both parties is effective as of the 1ˢᵗ day of January 2006, by and between Kellytoy (USA), Inc. ("Licensee") and Marvel Characters, Inc. and Marvel Enterprises, Inc. ("Marvel").

Reference is made to the license agreement D04200 dated the 1ˢᵗ day of January 2005 by and between Licensee and Marvel ("Agreement"). All terms used herein, which have been defined in the Agreement, shall have the same meaning as set forth in the Agreement.

In consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Marvel and Licensee hereby agree that the Agreement is amended as follows:

1.  Section 1(c) Licensed Articles: shall be deleted in its entirety and replaced with the following:

1) Amusement Plush Dolls (non-articulated), without vinyl heads
2) Amusement Plush Bean Bags
3) Amusement Plush Key Chains/Key Rings
4) Amusement Play Balls and Sports Balls (individual or in sets, inflatable and non-inflatable)
5) Amusement Flags and Banners
6) Amusement Coin Purses
7) Amusement Clip-ons (non-articulated)
8) Amusement Plush splash disks and/or balls
9) Amusement Novelty Chairs
10) Amusement Plush Danglers (hanging on a string or suction cup), non-articulated, limited to 5.5"
11) Amusement Plush Magnets
12) Amusement Plush Banks (non-articulated)
13) Amusement Plush Pens or Pencil Toppers
14) Amusement Vinyl Boxing Gloves
15) Amusement Pillows
16) Splash Balls and/or disk sold individually or in sets
17) 4" vinyl novelty balls.
18) Vinyl Boxing Gloves and/or Punching Bags sold individually or in sets
19) Hopper Balls
20) Inflatable Chairs
21) Basket Ball Hoop Set: limited to Spider-Man Classic Characters.


2.  Minimum Royalty Guarantee shall be deleted in its entirety and replaced with the following:

**Minimum Royalty Guarantee:** One Million Ten Thousand Dollars ($1,010,000).

**Paid:** Licensor acknowledges that Licensee has paid Six Hundred Fifty Thousand Dollars ($650,000).

**Advance:** Ten Thousand Dollars ($10,000) payable upon signing of this Amendment by the Licensee.

**Balance:**

Two Hundred Thousand Dollars ($200,000) payable on or before June 30, 2006 and

One Hundred and Fifty Thousand Dollars ($150,000) payable on or before June 30, 2007.


**Minimum Royalty Guarantee Allocation:**

Spider-Man Classic Characters: Five Hundred and Eight Five Thousand Dollars ($585,000)

Hulk Character Group: Two Hundred Thousand Dollars ($200,000).

X-Men Character Group: Forty Thousand Dollars ($40,000)

Fantastic Four Character Group: Ninety Five Thousand Dollars ($95,000)

Iron Man Character Group: Twenty Five Thousand Dollars ($25,000)

Ghost Rider Character Group: Twenty Five Thousand Dollars ($25,000).

Spider-Man and Friends Characters: Fifty Thousand Dollars ($50,000).

Daredevil Character Group, and Various Classic Character Group: Zero Dollars ($0).

Characters Groups/Spider-Man and Friends Characters/Spider-Man Classic shall not be cross collateralized, therefore Licensee shall not be entitled to credit the Minimum Royalty Guarantee due for one group against the Minimum Royalty Guarantee due for another group. For example, if the Minimum Royalty Guarantee is $600,000 for Spider-Man Classic Characters and Licensee earns $608,000 in royalties for Spider-Man Classic Characters, the excess $8000 cannot be applied to the Minimum Royalty Guarantee for the Ghost Rider Character Group.

Note: For the avoidance of doubt, Ten Thousand Dollars ($10,000) are being added by this Amendment.

In the event of any inconsistency between the terms of this Amendment and the terms of the Agreement, the terms of the Amendment shall prevail. Except as specifically amended hereby, all provisions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, and intending to be legally bound thereby the parties hereto have caused this instrument to be duly executed as of the day and year first above written.

MARVEL ENTERPRISES, INC.

By: _____
Name: _____
Title: _____
Date: _____

5/31/06  **JOHN TURITZIN**
          **Executive Vice President**
MARVEL CHARACTERS, INC.

By: _____
Name: _____
Title: _____
Date: **JOHN TURITZIN**
       **PRESIDENT**

5/31/06  ~~JOHN TU~~ ....
          ~~PRESIDENT~~

~~JOHN TURITZIN~~
~~PRESIDENT~~

KELLYTOY (USA) INC.

By: _Jonathan S. Kelly_
Name: _JONATHAN S. KELLY_
Title: _V PRESIDENT_
Date: _____

D04200-2        **SECOND AMENDMENT TO LICENSE AGREEMENT**

This amendment ("Amendment") when executed by both parties is effective as of the 1st day of April 2006, by and between Kellytoy (USA), Inc. ("Licensee") and Marvel Characters, Inc. and Marvel Enterprises, Inc. ("Marvel").

Reference is made to the license agreement D04200 dated the 1st day of January 2005 and first amendment D04200-1 dated the 1st day of January 2006 by and between Licensee and Marvel (collectively the "Agreement"). All terms used herein, which have been defined in the Agreement, shall have the same meaning as set forth in the Agreement. In consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Marvel and Licensee hereby agree that the Agreement is amended as follows:

1.    <u>Section 1(c) Licensed Articles</u>: shall be deleted in its entirety and replaced with the following:

    22) <u>**Non-Articulated Amusement Style and Quality Plush Dolls With Vinyl Heads**</u>: limited to the following Channels of Distribution: Amusement, Crane and Redemption Games only.

2.    <u>Section 1(h) Minimum Royalty Guarantee</u> shall be deleted in its entirety and replaced with the following:

    **Minimum Royalty Guarantee**: One Million Fifteen Thousand Dollars ($1,015,000).

    **Paid**: Licensor acknowledges that Licensee has paid Six Hundred Sixty Thousand Dollars ($660,000).

    **Advance**: Five Thousand Dollars ($5,000) payable upon signing of this Amendment by the Licensee.

    **Balance**:

    Two Hundred Thousand Dollars ($200,000) payable on or before June 30, 2006 and

    One Hundred and Fifty Thousand Dollars ($150,000) payable on or before June 30, 2007.

    <u>**Minimum Royalty Guarantee Allocation**</u>:

    <u>Spider-Man Classic Characters</u>: Five Hundred Eighty Thousand Dollars ($580,000)

    <u>Hulk Character Group</u>: Two Hundred Thousand Dollars ($200,000).

    <u>X-Men Character Group</u>: Forty Thousand Dollars ($40,000)

    <u>Fantastic Four Character Group</u>: Ninety Five Thousand Dollars ($95,000)

    <u>Iron Man Character Group</u>: Twenty Five Thousand Dollars ($25,000)

    <u>Ghost Rider Character Group</u>: Twenty Five Thousand Dollars ($25,000).

    <u>Spider-Man and Friends Characters</u>: Fifty Thousand Dollars ($50,000).

    <u>Daredevil Character Group, and Various Classic Character Group</u>: Zero Dollars ($0).

    Characters Groups/Spider-Man and Friends Characters/Spider-Man Classic shall not be cross collateralized, therefore Licensee shall not be entitled to credit the Minimum Royalty Guarantee due for one group against the Minimum Royalty Guarantee due for another group. For example, if the Minimum Royalty Guarantee is $600,000 for Spider-Man Classic Characters and Licensee earns $608,000 in royalties for Spider-Man Classic Characters, the *excess* $8,000 cannot be applied to the Minimum Royalty Guarantee for the Ghost Rider Character Group.

    <u>Note</u>: For the avoidance of doubt, Five Thousand Dollars ($5,000) are being added by this Amendment.

1

{00033327 JMS}

In the event of any inconsistency between the terms of this Amendment and the terms of the Agreement, the terms of the Amendment shall prevail. Except as specifically amended hereby, all provisions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, and intending to be legally bound thereby the parties hereto have caused this instrument to be duly executed as of the day and year first above written.

MARVEL ENTERPRISES, INC.               KELLYTOY (USA) INC.

By: _____                  By: _____
Name: _____                  Name: _JONATHAN KELLY_
Title: _____                 Title: _V - PRESIDENT_
Date: _____                  Date: _____
    5/31/06    JOHN TURITZIN
               Executive Vice President

MARVEL CHARACTERS, INC.

By: _____
Name: _____
Title: _____
Date: _____

    5/31/06    JOHN TURITZIN
               PRESIDENT

# EXHIBIT B

| Character Name | Publication Date | Copyright Reg. No. | Renewal Reg. No. |
|---|---|---|---|
| Spider-Man | 6/5/1962 | B 976775 | RE 497 761 |
| Hulk | 3/1/1962 | B 958840 | RE 497 679 |
| Silver Surfer | 12/9/1965 | B 238357 | RE 645 181 |
| Captain America | 12/20/1940 | B 480415 | B 683000 |
| Iron Man | 12/10/1962 | B 12121 | RE 498 065 |
| Daredevil | 2/4/1964 | B 93253 | RE 599 633 |
| Thor | 6/5/1962 | B 975408 | RE 497 753 |
| Fantastic Four | 8/8/61 | B 917811 | RE 443-829 |
| X-Men | 7/2/63 | B 51855 | RE 559 226 |
| Wolverine | 6/4/74 | B 956186 | N/A |
| Ghost Rider | 5/22/73 | B 846936 | N/A |
| Cyclops | 7/2/63 | B 51855 | RE 559 226 |
| Magneto | 7/2/63 | B 51855 | RE 559 226 |
| Rogue | 7/14/81 | TX 757-767 | N/A |
| Sabertooth | 4/5/77 | B 264186 | N/A |
| Storm | 2/25/75 | B 13002 | N/A |

# EXHIBIT C

| Mark | Class | Registration No. | Reg. Date | Serial No. | Date Filed | Goods/Services |
|------|-------|------------------|-----------|------------|------------|----------------|
| Captain America | 16 & 28 | 1,349,244 | 07/16/1985 | 73/474,726 | 4/10/1984 | Printed stickers, toys and playthings, particularly toy figures and toy vehicles |
| Captain America* | 16 | 854,655 | 08/13/1968 | 72/278,016 | 8/10/1967 | Magazine published periodically, particularly, comic books and magazines |
| Captain America* | 28 | 1,752,691 | 02/16/1993 | 74/214,395 | 10/17/1991 | Toys, games and playthings; namely, toy action figures and accessories, bendable figurines, action playsets sold as a unit for creative play activities, kites, inflatable toys, role playing games, model kits, video game cartridges and software programs for video games |
| Cyclops* | 16 | 1,900,602 | 06/20/1995 | 74/463,704 | 11/29/1993 | Publications; namely, comic books and comic magazines and stories in illustrated form; trading cards |
| Daredevil* | 16 | 891,294 | 05/19/1970 | 72/278,716 | 8/21/1967 | Publications, particularly comic magazines and stories in illustrated form |
| Daredevil | 28 | 3,311,091 | 10/16/2007 | 77/074200 | 01/02/2007 | Toy action figures and accessories therefore |
| Daredevil* | 25 | 2,074,063 | 06/24/1997 | 75/177,596 | 10/7/1996 | Clothing, namely, t-shirts, shirts |
| Fantastic Four* | 16 | 893,303 | 6/23/1970 | 72/276,841 | 7/26/1967 | Publications, particularly comic books and magazines |
| Fantastic Four* | 25 | 2,211,338 | 12/15/1998 | 74/580,343 | 9/30/1994 | T-shirts, hats |
| Fantastic Four* | 28 | 2,110,985 | 11/4/1997 | 74/580,342 | 9/30/1994 | Toy action figures and accessories, toy vehicles, action playsets (sold as a unit for creative play activities), toy play sets for use with action figures, inflatable toys, video game cartridges and software programs for video games |
| Ghost Rider* | 16 | 1,044,113 | 7/20/1976 | 73/041,323 | 1/9/1975 | Publications, particularly comic books and magazines and stories in illustrated form |
| Ghost Rider | 9 | 3,357,231 | 12/18/2007 | 78/619,800 | 4/29/2005 | Prerecorded videotapes and dvds featuring live action motion pictures; video game software for hand-held game units, video game cartridges for hand-held game units; video game cartridges; video game discs; video game software programs; interactive video |

| Mark | Class | Registration No. | Reg. Date | Serial No. | Date Filed | Goods/Services |
|---|---|---|---|---|---|---|
| | | | | | | game programs; software for playing interactive multiplayer computer games; computer game programs |
| Ghost Rider* | 28 | 2,084,204 | 7/29/1997 | 74/378,930 | 4/12/1993 | Toys, games and playthings, namely, action figures and accessories therefore |
| Hulk* | 16 | 970,791 | 10/16/1973 | 72/419,351 | 3/24/1972 | Publications, particularly comic books and magazines and stories in illustrated form |
| Hulk | 28 | 1,249,928 | 08/30/1983 | 73/297,729 | 2/19/1981 | Toys, games and playthings, particularly, dolls, puzzles, water-play toys, snow, sand and lawn toys, inflatable toys, battery-powered toys, ride-on toys, toy figures and accessories; toy masks; balls; yo-yo's; equipment sold as a unit for playing board, target and card games; playsets sold as a unit for creative play activities; toy chests; toy banks; bubble making sets; kites; toy watches; hobby-craft kits containing modeling compound, toy weapons, puppets, throw-and-catch toys, bats, marbles, electronic hand-held games; toy vehicles and accessories; and rack toys |
| Hulk | 16 | 1,252,880 | 10/04/1983 | 73/297,753 | 2/19/1981 | Posters, story books, activity books, particularly sticker books, coloring books, kits primarily comprised of crayons, markers, paints, paint brushes and parts sold as unit for coloring, painting and handicraft activities, slates, school supplies, particularly book bags, pencil cases, pencil sharpeners, staplers and bookmarks, playing and trading cards |
| Hulk | 18 | 1,215,835 | 11/09/1982 | 73/297,782 | 2/19/1981 | Tote bags, backpacks and knapsacks |
| Hulk | 24 | 1,231,157 | 03/15/1983 | 73/299,007 | 2/27/1981 | Bed linens; and beach towels |
| Hulk | 25 | 1,242,914 | 06/21/1983 | 73/297,749 | 2/19/1981 | Clothing, particularly underwear, hosiery, sleepwear, swimwear; outerwear; particularly rainwear, coats and hats; leisurewear; particularly playsuits, |

| Mark | Class | Registration No. | Reg. Date | Serial No. | Date Filed | Goods/Services |
|---|---|---|---|---|---|---|
| | | | | | | sweatshirts, t-shirts; costumes and footwear |
| The Incredible Hulk * | 16 | 890,917 | 05/12/1970 | 72/277,675 | 8/7/1967 | Publications, particularly comic books and magazines and stories in illustrated forms |
| Iron Man | 9 | 2,442,890 | 04/10/2001 | 74/002,106 | 11/16/1989 | Motion picture and sound recording material, namely, pre-recorded video cassettes and video discs, all featuring comic book characters and action adventure material but excluding subject matter featuring the sport of football |
| Iron Man | 25 | 2,207,783 | 12/08/1998 | 73/839,835 | 11/15/1989 | Clothing, namely, swimwear, shirts, and headwear |
| Iron Man | 28 | 1,355,280 | 08/20/1985 | 73/474,728 | 4/10/1984 | Toys and playthings particularly toy figures |
| Iron Man* | 16 | 893,304 | 06/23/1970 | 72/278,017 | 8/10/1967 | Publications, particularly comic books and magazines and stories in illustrated form |
| Magneto | 16 | 1,901,698 | 06/27/1995 | 74/463,701 | 11/29/1993 | Publications; namely, comic books and comic magazines and stories in illustrated form; trading cards |
| Rogue | 16 | 1,911,299 | 08/15/1995 | 74/463,703 | 11/29/1993 | Publications; namely, comic books and comic magazines and stories in illustrated form; trading cards |
| Sabretooth | 16 | 1,836,773 | 05/17/1994 | 74/425,287 | 8/16/1993 | Publications; namely, comic books and comic magazines and stories in illustrated form |
| Silver Surfer | 25 | 3,126,798 | 08/08/2006 | 78/705,023 | 9/1/2005 | Clothing, namely, t-shirts, underwear, hats, ties, sneakers |
| Silver Surfer | 28 | 2,353,959 | 05/30/2000 | 75/235,793 | 2/3/1997 | Toys, games and playthings, namely, toy action figures and accessories therefor |
| Silver Surfer* | 16 | 2,353,958 | 05/30/2000 | 75/235,789 | 2/3/1997 | Printed matter and paper goods, namely, comic books and comic magazines and stories in illustrated form; books, activity books, stickers; posters; trading cards; collector cards |
| The Silver Surfer | 16 | 890,922 | 05/12/1970 | 72/308,524 | 9/30/1968 | Publications, particularly comic books and magazines and stories in illustrated form |
| The Amazing | 16 | 885,910 | 02/10/1970 | 72/278,013 | 8/10/1967 | Publications, particularly comic books and magazines |

| Mark | Class | Registration No. | Reg. Date | Serial No. | Date Filed | Goods/Services |
|---|---|---|---|---|---|---|
| Spider-Man* | | | | | | |
| Spider-Man | 16 | 1,256,062 | 11/01/1983 | 73/297,795 | 2/19/1981 | and stories in illustrated form Posters; story books; activity books, particularly sticker books; coloring books; kits primarily comprised of crayons, markers, paints, paint brushes and parts sold as units for coloring, painting and handicraft activities; slates; school supplies, particularly, book bags, pencil cases, pencil sharpeners, staplers, bookmarks, playing cards, paper napkins, placemats, paper party hats and tablecloths |
| Spider-Man | 18 | 1,231,920 | 03/22/1983 | 73/297,794 | 2/19/1981 | Wallets; key-cases; general purpose sports bags; tote bags; backpacks and knapsacks |
| Spider-Man | 21 | 1,206,213 | 08/24/1982 | 73/297,785 | 2/19/1981 | Tableware – namely, mugs, cups, tumblers, bowls and plates; lunch box with insulated beverage container; and personal grooming articles – namely, combs, brushes, toothbrushes and toothbrush holders |
| Spider-Man | 25 | 1,267,236 | 02/14/1984 | 73/297,767 | 2/19/1981 | Clothing, particularly, underwear, sleepwear and robes; swimwear; outerwear, particularly rainwear, coats and hats; leisurewear, particularly play suits, sweat shirts, t-shirts and overalls; costumes; footwear; and hosiery |
| Spider-Man | 28 | 1,251,774 | 09/20/1983 | 73/297,747 | 2/19/1981 | Toys; games and playthings, particularly, dolls, puzzles, water-play toys, snow, sand and lawn toys, inflatable toys, battery –powered toys, ride-on toys, toy figures and accessories; toy masks; balls; yo-yo's; equipment sold as a unit for playing board, target and card games; playsets sold as a unit for creative play activities; toy chests; toy banks; bubble making sets; kites; toy watches; hobby-craft kits containing modeling compound, toy weapons, puppets, throw-and-catch toys, bats, marbles, electronic hand-held games; toy vehicles and accessories; roller skates; |

| Mark | Class | Registration No. | Reg. Date | Serial No. | Date Filed | Goods/Services |
|---|---|---|---|---|---|---|
| | | | | | | and rack toys |
| Spider-Man* | 16 | 959,887 | 05/29/1973 | 72/418,623 | 3/16/1972 | Publications, particularly comic books and magazines and stories in illustrated form |
| Spider-Man | 24 | 1,229,926 | 03/08/1983 | 73/299,006 | 2/27/1981 | Bed Linens; Draperies; Bath Linens, Particularly, Bath and Hand Towels and Washcloths; and Beach Towels. |
| Spider-Man | 28 | 1,300,723 | 10/16/1984 | 73/412,770 | 2/8/1983 | Video Games Cartridges |
| Spider-Man Rocks! | 41 | 2,736,463 | 07/15/2003 | 76/448,286 | 9/10/2002 | Entertainment services namely live performance exhibitions featuring costumed characters |
| Ultimate Spider-Man | 16 | 2,591,650 | 07/09/2002 | 78/040,870 | 12/28/2000 | Publications, namely comic books and comic magazines and printed stories in illustrated form featured in books and magazines |
| Storm* | 16 | 1,858,598 | 10/18/1994 | 74/463,916 | 11/29/1993 | Publications, namely comic books and comic magazines and stories in illustrated form |
| THOR* | 16 | 958,186 | 05/01/1973 | 72/419,350 | 3/24/1972 | Publications, particularly, comic books and magazines and stories in illustrated form |
| THOR | 9 | | | 77/168992 | 04/30/2007 | Bicycle helmets; Computer game cartridges; Computer game discs; Computer game programs; Computer game software; Interactive multimedia computer game program; Interactive video game programs; Interactive video games of virtual reality comprised of computer hardware and software; Pre-recorded CDs, video tapes, laser disks and DVDs featuring music and/or live action programs or motion pictures or animated cartoons; Sunglasses; Video game cartridges; Video game discs; Video game software |
| THE MIGHTY THOR | 25 | | | 77/169074 | 04/30/2007 | Sweat pants; Sweat shirts; T-shirts; Ties; Shirts; Shorts; Slacks; Sleepwear; Sneakers; Overalls; Underwear; Vests; Visors; Halloween costumes; Hats; Headbands; Jackets; Belts; Coats; Rainwear; |

| Mark | Class | Registration No. | Reg. Date | Serial No. | Date Filed | Goods/Services |
|---|---|---|---|---|---|---|
| | | | | | | Shoes; Robes; Sandals; Scarves; Beach shoes; Boots; Gloves; Suspenders; Masquerade costumes; Socks |
| THE MIGHTY THOR | 28 | 2,933,886 | 03/15/2005 | 78/043,582 | 1/17/2001 | Toys, games and playthings, namely, toy action figures and accessories therefor, toy model hobby craft kits |
| THE MIGHTY THOR* | 16 | 890,918 | 05/12/1970 | 72/278,018 | 8/10/1967 | Publications, particularly comic magazines and stories in illustrated form |
| THE MIGHTY THOR | 41 | | | 77/169091 | 04/30/2007 | Entertainment and education services |
| Wolverine | 28 | 2,922,814 | 02/01/2005 | 78/293,863 | 8/29/2003 | Toys, games and playthings, namely, toy action figures and accessories, bendable figurines, toy vehicles, action playsets sold as a unit for creative play activities, toy environments for use with action figures, role playing games, model hobbycraft kits for assembling and painting plastic models of comic book characters, hand held unit for playing electronic games |
| Wolverine* | 16 | 1,395,639 | 06/03/1986 | 73/537,855 | 5/14/1985 | Publications, particularly comic magazines and stories in illustrated form |